CHARLES GREINER & CO., INC.,
d/b/a Philadelphia Cervical Collar
Co., Plaintiff–Appellant,

v.

MARI–MED MFG., INC., William R.
Burns, Paul W. Burns and Gary R.
Burns, Defendants–Appellees.

No. 91–1192.

United States Court of Appeals,
Federal Circuit.

April 27, 1992.

Philip Rodman, Rodman & Rodman, White Plains, N.Y., argued for plaintiff-appellant. With him on the brief was Harvey E. Bumgardner, Jr., New York City.

Steven Kreiss, Townsend, Snider & Banta, Washington, D.C., argued for defendants-appellees. With him on the brief was Herbert B. Barlow, Jr., Barlow & Barlow, Ltd., Cranston, R.I.

Before PLAGER, Circuit Judge, SMITH, Senior Circuit Judge, RADER, Circuit Judge.

RADER, Circuit Judge.

In 1989, Charles Greiner & Co. sued Mari–Med Manufacturing for infringement of U.S. Patent No. 3,756,226, for trademark infringement under 15 U.S.C. § 1114 (1988), and for unfair competition under 15 U.S.C. § 1125. Greiner's '226 patent covers a two-piece cervical collar or neck brace. Greiner has registered the mark PHILADELPHIA CERVICAL COLLAR.

After a six-day trial, the United States District Court for the District of Rhode Island held that defendants had not infringed either the '226 patent or the trademark, 754 F.Supp. 951. The trial court also determined that Greiner had not proven unfair competition. This court affirms.

## BACKGROUND

Both Greiner and Mari–Med manufacture cervical collars. The term "cervical" denotes the neck portion of the spine which supports the head. Treatment of cervical injuries often includes wearing of a collar. A cervical collar eases strain on the spine during healing. Emergency medical technicians also put cervical collars on accident victims to avoid compounding injuries during movement to a hospital.

Cervical collars usually feature two pieces, a front half and a rear half, which join to provide support to the spine. Before the '226 patent, the Patent and Trademark Office issued U.S. Patent No. 3,662,057 to Webster, No. 3,042,027 to Monfardini, No. 3,504,667 to McFarlane, and 2,818,063 to Smith, for cervical collars. Much of this prior art featured cervical collars with rigid supporting halves cushioned by softer material.

The '226 patent claims a cervical collar with two mating halves. The two U-shaped halves are made of a soft lightweight flexible foam. The two halves overlap around the neck. A strap holds the halves together. A rigid support member (Figs. 2 & 3, Nos. 30 & 62) located only at the bight of each half provides support when the collar is in place. Figures 1–3 of the '226 patent show:

FIG. 1

FIG. 2

FIG. 3

Claim 1 of the '226 patent reads:

A cervical collar comprising first and second discrete body halves, one of said body halves being a front half and the other being a rear half, each half being U-shaped and preformed from a soft flexible, lightweight closed cell foam polymeric plastic material, each half being provided with air holes extending therethrough, adjustable strap means having a portion coupled to each of said halves for releasably interconnecting the free ends of said halves in overlapping relation, a first rigid support member fixedly secured to and located only at the bight of the front half, a second differently shaped rigid support member fixedly secured to and located only at the bight of the rear half.

(Emphasis added.)

During prosecution of the application for the '226 patent, the inventors added the underlined phrases in the above claim. Before these additions, the examiner had rejected the claims as obvious over the Web-ster patent in view of the Monfardini patent. To escape a section 103 rejection, the applicants for the '226 patent limited the claims to a rigid support member located only at the bight of each half of the collar. The '226 patent specification explained that the invention "combines maximum comfort [and] maximum adjustability, with minimum weight." '226 Patent, Col. 1, lines 31–33. In other words, the invention was more comfortable because it limited the rigid supports to only necessary locations.

William Burns designed the Burns collar to compete with Greiner's collar. Later William Burns worked for Mari–Med. Paul and Gary Burns were officers, directors, and owners of Mari–Med. In 1990, William Burns received U.S. Patent No. 4,940,043 for a cervical collar. In the Burns collar, as shown for instance in figures 2 and 6 from the '043 patent, the imbedded rigid support member (Fig. 6, No. 24) extends from the bend in the collar to just short of the ends of each half:

FIG. 2

F I G. 6

At trial, Burns introduced expert testimony that extension of the support member beyond the bend "provides a significant degree of lateral flexion stability" not found in the Greiner collar.

At trial, Greiner presented testimony that some of Burns' distributors had marketed the Burns collar as a "Generic Brand of Philadelphia Collar," a "Generic Philadelphia Collar," a "Philadelphia–Type Collar," and a "Philadelphia Style Extrication Collar." Mari–Med and Burns denied any awareness that its dealers sold collars under those names. Mari–Med and Burns further denied encouraging its customers to use Greiner's mark.

## DISCUSSION

### I.

■ This court reviews patent infringement findings as questions of fact. Therefore, only clear errors warrant correction. *Raytheon Co. v. Roper Corp.,* 724 F.2d 951, 956, 220 USPQ 592, 596 (Fed.Cir. 1983), *cert. denied,* 469 U.S. 835, 105 S.Ct. 127, 83 L.Ed.2d 69 (1984); *Hartness Int'l v. Simplimatic Eng'g Co.,* 819 F.2d 1100, 1110, 2 USPQ2d 1826, 1833 (Fed.Cir.1987). Claim interpretation is the first step in the two-part infringement determination.

*Fromson v. Advance Offset Plate,* 720 F.2d 1565, 1569, 219 USPQ 1137, 1140 (Fed. Cir.1983). Without factual disputes, claim interpretation proceeds as a question of law. *Key Mfg. Group v. Microdot, Inc.,* 925 F.2d 1444, 1448, 17 USPQ2d 1806, 1809 (Fed.Cir.1991). When a trial court, however, resolves factual disputes over the meaning of claims, this court reviews under the clearly erroneous standard. *Palumbo v. Don–Joy Co.,* 762 F.2d 969, 974, 226 USPQ 5, 7–8 (Fed.Cir.1985). In interpreting a disputed claim, a trial court considers the specification and prosecution history. *Moeller v. Ionetics, Inc.,* 794 F.2d 653, 656, 229 USPQ 992, 994 (Fed.Cir.1986).

■ After interpreting the claim, the final step of an infringement analysis is to demonstrate whether the accused device is within the scope of the claim. *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 452, 227 USPQ 293, 295 (Fed.Cir. 1985). To infringe, an accused device must embody exactly each claim limitation or its equivalent. *Julien v. Zeringue,* 864 F.2d 1569, 1571, 9 USPQ2d 1552, 1553 (Fed.Cir.), *cert. denied,* 493 U.S. 917, 110 S.Ct. 276, 107 L.Ed.2d 256 (1989).

■ Unfair competition and trademark infringement, like patent infringement, in-

volve questions of fact reviewed under the clearly erroneous standard. *Keds Corp. v. Renee Int'l Trading*, 888 F.2d 215, 222, 12 USPQ2d 1808, 1813 (1st Cir.1989); *Fisher Stoves, Inc. v. All Nighter Stove Works*, 626 F.2d 193, 206 USPQ 961 (1st Cir.1980).

## II.

■ In this case, the key claim interpretation issue—also determinative of the patent infringement issue—is the meaning of "bight." As defined by *Shorter Oxford English Dictionary* 178 (3d ed. 1959), "bight" means "a bending or bend." In general, "bight" as used in the '226 claims describes the location where each cervical collar-half bends.

This general understanding, however, still left the district court with a basic claim interpretation dispute, namely, how far does the bight extend around each collar-half. Greiner contends that the bight extends substantially around the U-shaped halves. Burns reads "bight" in the claims to mean a narrow area at the extreme front and rear of the respective halves.

The district court correctly interpreted the term in light of the specification and prosecution history of the '226 patent. In particular, the trial court consulted three distinct portions of the '226 patent specification. Column 2, lines 13–17, for instance, states:

Thus, the body 13 tapers away from the bight portion so that the vertical dimensions of the end portions 16 and 18 are only about one-half the vertical height of the bight portion when viewed in elevation or section as shown in FIG. 3.

This specification language places the bight portion of the collar at the closed end of the collar halves when viewed from the side. The specification notes that the vertical height of the collar-half body "tapers away from the bight portion." Examination of Figure 3 shows that the body height begins to "taper away" just beyond the reach of the narrow rigid support members. Thus, as the district court noted, the specification regards the bight as "approximately the width of the rigid supporting members."

Two other specification references reinforce that conclusion. Column 2, lines 18–19, states:

The upper end of the bight portion of the body 13 is shaped to provide a chin cavity 26.

Column 2, lines 28–30, also clarifies:

Member 30 [the rigid support member] ... extends for substantially the entire length of the bight portion on body 13.

Lines 18–19 suggest that the bight does not extend around the collar-half body, but occupies only that space near one end where the chin rests. Lines 28–30 equate the width of the rigid support member with the bight portion.

Similarly the prosecution history of the '226 patent suggests that the inventors limited the extent of the bight. After an initial rejection under section 103, the applicants for the '226 patent amended their claims. They specified that the patent claimed only a collar which located rigid support members "only at the bight." This evidence again supports the district court's conclusion that the "bight" does not extend beyond the narrow width of the rigid support members. This court discerns no clear error in the trial court's conclusion.

The trial court determined that the Burns collar did not literally infringe the '226 patent. As properly interpreted, the '226 patent limited the collar's bight to a narrow area at the extreme front and back of the collar. The trial court observed that the Burns collar's imbedded support member extends substantially around the entire length of each collar-half. The Burns collar did not include a "rigid support member ... located only at the bight" as claimed in the '226 patent. Therefore, the district court correctly concluded that the Burns collar did not literally infringe the '226 patent.

## III.

■ The trial court also determined that the Burns collar did not infringe the '226 patent under the doctrine of equivalents. The doctrine of equivalents is an equitable doctrine which prevents fraud on a patent.

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). The doctrine traces its earliest origins to Supreme Court Justice Joseph Story. Presiding over a trial as circuit justice, Justice Story stated:

> Mere colorable differences, or slight improvements, cannot shake the right of the original inventor.

*Odiorne v. Winkley,* 18 F.Cas. 581, 582 (C.C.D.Mass.1814) (No. 10,432) (Story, C.J.). Justice Bushrod Washington, also sitting as a circuit justice, seems to have enunciated the same principle. *See Gray v. James,* 10 F.Cas. 1015, 1016 (C.C.D.Pa.1817) (No. 5718) (Washington, C.J.) (charging jury) ("[w]here the [accused and the claimed] machines are substantially the same, and operate in the same manner to produce the same result, they must be in principle the same.").

In 1950, the doctrine underwent a modern rebirth in *Graver Tank.* The Supreme Court there traced the doctrine back to its Supreme Court origins in *Winans v. Denmead,* 56 U.S. (15 How.) 330, 14 L.Ed. 717 (1854). *Graver Tank,* 339 U.S. at 608, 70 S.Ct. at 856. Whether in its earliest manifestations or its more recent rebirth, the doctrine retained its traditional equitable limits. It prevented "fraud on a patent." *Id.* Specifically, it prevented a copyist from evading patent claims by what the Court believed to be insubstantial changes. *Id.*

■ Most important, however, a court must, in applying the doctrine, avoid significant conflict with the fundamental principle that claims define the limits of patent protection. *See, e.g., Continental Paper Bag Co. v. Eastern Paper Bag Co.,* 210 U.S. 405, 419, 28 S.Ct. 748, 751, 52 L.Ed. 1122 (1908) ("[T]he claims measure the invention."). This court has repeatedly stated that the doctrine must not clash with the legal significance of claims:

> Application of the doctrine of equivalents is the exception, however, not the rule, for if the public comes to believe (or fear) that the language of patent claims can never be relied on, and that the doctrine of equivalents is simply the second

prong of every infringement charge, regularly available to extend protection beyond the scope of the claims, then claims will cease to serve their intended purpose.

*London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1538, 20 USPQ2d 1456, 1458 (Fed.Cir.1991); *cf. Wilson Sporting Goods Co. v. David Geoffrey & Assoc.,* 904 F.2d 677, 684, 14 USPQ2d 1942, 1948 (Fed.Cir.), *cert.denied,* —— U.S. ——, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990).

One important rule which prevents the doctrine of equivalents from clashing with claim significance is prosecution history estoppel. *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1362, 219 USPQ 473, 481 (Fed.Cir.1983). As early as 1880, the Supreme Court enunciated this estoppel rule to limit the scope of the doctrine of equivalents. *Goodyear Dental Vulcanite Co. v. Davis,* 102 U.S. 222, 227–28, 26 L.Ed. 149 (1880); *see also Smith v. Magic City Kennel Club,* 282 U.S. 784, 51 S.Ct. 291, 75 L.Ed. 707 (1931). This rule, as well as careful confinement of the doctrine of equivalents to its proper equitable role, promotes certainty and clarity in determining the scope of patent rights.

■ In this case, the Rhode Island district court determined that Greiner did not satisfy the *Graver Tank* test and applied the doctrine of prosecution history estoppel. Burns did not attempt to evade Greiner's patent by insubstantial changes, but instead designed a collar which achieves a better result in a different way. The Burns collar provides comfortable support throughout the collar not just at the front and rear.

Moreover, as the district court correctly noted, prosecution history estoppel limits Greiner's invocation of the doctrine of equivalents. During prosecution, the '226 patent applicants limited their claim to a collar with rigid supports only at the bight. Greiner cannot now capture exclusive rights to a collar with rigid support that extends substantially beyond the bight. This court discerns no clear error in the trial court's conclusion that Greiner did not

infringe either literally or by the doctrine of equivalents.

### IV.

The Lanham Act [section 32], 15 U.S.C. § 1114(1)(a) (1988), imposes civil liability on persons who, without consent of a registered trademark's owner:

> [U]se in commerce any ... colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods ... which such use is likely to cause confusion, or to cause mistake, or to deceive....

Thus, to show that Mari–Med violated its rights, Greiner must prove, among other things, that Mari–Med's alleged use of terms like "Philly Collar" created a likelihood of confusion about the source of the Burns collar. The Rhode Island district court determined that Greiner offered insufficient evidence that Mari–Med's actions caused a likelihood of confusion.

The United States Court of Appeals for the First Circuit has identified several factors to examine when determining a likelihood of confusion.* These factors include the similarity of the marks and goods, the relationship between the parties' channels of trade, the correlation between the parties' advertising, the classes of prospective purchasers, any evidence of actual confusion, the defendant's intent in use of its mark, and the strength of the plaintiff's mark. *Astra Pharmaceutical Prods. v. Beckman Instruments*, 718 F.2d 1201, 1205, 220 USPQ 786, 789 (1st Cir.1983); *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487, 212 USPQ 246, 250 (1st Cir.1981).

■ Greiner's evidence of Mari–Med's alleged trademark infringement centered on two letters from William Burns to Richards Medical Company during negotiations for sale of the Burns collar. In these letters, Burns referred to his collar as a "Philly Collar." Undisputed evidence showed that both Burns and Richards knew the source of the Burns' collar. Even assuming that "Philly Collar" and PHILADELPHIA CERVICAL COLLAR are arguably similar, the district court correctly concluded that these isolated uses did not show any likelihood of confusion about the source of cervical collars. On the direct infringement count, Greiner did not show, for instance, correlations in advertising, any intent of Burns or Mari–Med to misuse Greiner's mark, or substantial evidence of actual confusion. This court discerns no error in the district court's conclusion that Burns did not infringe Greiner's rights in its mark.

■ With respect to inducement of trademark infringement, the trial court concluded that Greiner did not show that Mari–Med or Burns induced others to infringe rights in the registered mark. The Supreme Court recognizes that the Lanham Act imposes civil liability on persons who induce another to infringe a trademark. *Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 853–54, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982). The test for liability is whether "a manufacturer or distributor intentionally induces another to infringe a trademark, or [whether] it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement." *Id.* at 854, 102 S.Ct. at 2188.

Greiner's evidence focused on distributors of Burns collars who used terms, such as "Philly Type Collar," "Philly Style Collar," or "Generic Philadelphia Collar." These terms appeared in invoices or publications of Emergency Medical Supplies, Inc., Texas Medical Industries, Emergency Medical Products, Inc., and others. Despite thorough consideration of this evidence, the district court remained "unper-

* In *Windsurfing International v. AMF Inc.,* 828 F.2d 755, 4 USPQ2d 1052 (Fed.Cir.1987), this court applied a regional circuit's trademark law in a case whose appellate jurisdiction was based on 28 U.S.C. § 1295 (1988) (appeals from district courts of cases arising in whole or part under 28 U.S.C. § 1338 (1988)). On the issues of this case, the First Circuit's trademark law does not differ from the law this circuit has applied in other trademark cases. Therefore, this court need not inquire whether regional circuit law which drastically deviates from comparable law in this and other circuits would govern.

suaded that Burns intended that his vendees infringe plaintiff's trademark." Moreover, the trial court discerned "[n]o credible evidence ... that Burns continued to supply his collar to vendees with knowledge that they were infringing [Greiner's] registered mark." Without sufficient evidence of any alleged inducement of infringement, this court detects no error in the trial court's judgment.

### V.

█ Section 1125(a) of title 15 [section 43(a)], prohibits certain forms of unfair competition:

> Any person who ... in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact ... shall be liable in a civil action....

Greiner charged that Burns appropriated the Philadelphia Cervical Collar's trade dress and caused confusion about the source of the Burns collar. The district court correctly noted, among other explanations, that the shape of the Philadelphia Cervical Collar was a functional design for which Greiner could not claim exclusive use. *Keds Corp.*, 888 F.2d at 221; *Fisher Stoves*, 626 F.2d at 195. Applying First Circuit law, this court discerns no error in the district court's full explanation that Burns did not violate section 1125.

### VI.

Greiner also appeals both the district court's refusal to allow Greiner to amend its complaint and to add a party. This court reviews such actions only for abuses of discretion. *Tenneco Resins v. Reeves Bros.*, 752 F.2d 630, 633, 224 USPQ 536, 528 (Fed.Cir.1985). After its suit had been pending for more than a year, Greiner made these motions only six days before commencement of trial. The trial court certainly did not abuse its discretion by

denying motions to add counts and parties on the eve of trial.

AFFIRMED.