**FAIRFAX DENTAL (IRELAND) LTD., Plaintiff,**

v.

**STERLING OPTICAL CORP. f/k/a IPCO Corporation, and Coltene Whaledent, Inc., Defendants and Counterplaintiffs,**

v.

**FAIRFAX DENTAL LTD. and G. Cyril Kay, Counterdefendants.**

**FAIRFAX DENTAL (IRELAND) LTD., Plaintiff,**

v.

**S.J. FILHOL, LTD., Filhol Dental Manufacturing Company, Ltd., Stuart Julian Filhol, Catherine M. Filhol, Filpin, Inc., and Coras Trachtala, Defendants.**

No. 85 Civ. 4884 (RJW).

United States District Court, S.D. New York.

Dec. 7, 1992.

significance of the non-disclosed material to the case at hand.

James N. Dresser, Antonelli, Terry, Stout & Kraus, Washington, DC, Harry A. Gottimer, Kirlin, Campbell & Keating, New York City, for plaintiff.

Berj A. Terzian, John J. Lauter, Victor N. Balancia, Pennie & Edmonds, New York City, for defendant Coltene Whaledent, Inc.

Eliot Gerber, Wyatt, Gerber, Burke & Badie, New York City, for Filhol defendants.

## OPINION

ROBERT J. WARD, District Judge.

In this patent case, plaintiff, Fairfax Dental (Ireland) Ltd. ("Fairfax"), alleges infringement, pursuant to 35 U.S.C. § 271,

against two groups of defendants: (1) Sterling Optical Corp. f/k/a Ipco Corporation and Coltene Whaledent, Inc. (collectively "Whaledent")[1] and (2) S.J. Filhol, Ltd., Filhol Dental Manufacturing Co., Ltd., Stuart Julian Filhol, Catherine M. Filhol, Filpin, Inc., and Coras Trachtala (collectively "Filhol"). Fairfax moves for an order, pursuant to Rule 56, Fed.R.Civ.P., for partial summary judgment against Whaledent. Whaledent cross-moves for summary judgment. The parties have stipulated to facts over which there is no genuine issue to be tried. For the reasons that follow, the Court denies plaintiff's motion for partial summary judgment and grants defendant Whaledent's cross-motion for summary judgment.[2]

## BACKGROUND

Fairfax, Whaledent, and Filhol are competitors in the sale of dental reinforcing pins, which are threaded pins used by dentists to anchor the restoration of a badly decayed tooth. Plaintiff accuses defendants of manufacturing and selling pins that infringe United States patent No. 4,189,834 (the "'834 patent"). While Fairfax does not assert that the accused pins literally infringe the '834 patent, it does argue that Whaledent and Filhol have infringed the patent under the doctrine of equivalents. Whaledent responds that the accused pins cannot be held to have infringed the patent for two reasons: (1) because Fairfax cannot meet the three part substantiality test necessary for proving infringement under the doctrine of equivalents, and (2) because two limitations to the equivalency doctrine preclude its consideration in this case.

1. When this action was filed, defendant, Sterling Optical Corp., was known as Ipco Corp. and was the owner and operator of the business now owned and operated by Whaledent. For the purposes of this opinion, Ipco and Whaledent will be categorized as one entity.

2. Fairfax does not move for summary judgment against the Filhol defendants and Filhol does not cross-move against Fairfax. Nevertheless, a judgment in favor of Whaledent will certainly inure to the benefit of Filhol. Therefore, the Court deems it appropriate to describe and discuss Filhol's participation in this dispute.

## A. Types of Dental Reinforcing Pins

### 1. The '834 Patent

The '834 patent, was issued by the United States Patent and Trademark Office ("PTO") on February 26, 1980 to inventor Andrew J. Smith ("Smith") for an invention in dental reinforcing pins. Revised Rule 3(g) Statement ¶ 5.[3] It was assigned to plaintiff Fairfax on April 23, 1983 and recorded at the PTO on June 24, 1983. *Id.* The patent covers a self-threading, self-shearing dental device that anchors a superstructure to a tooth understructure. *Id.* ¶ 7. Claim 1 of the patent describes the device as follows:

A dental anchoring device comprising a threaded portion for self-threading insertion in a bore formed in a tooth dentin[ ], a connecting portion forming an integral unit with said threaded portion and having an elongated shank adapted for direct positive attachment in a powered dental handpiece, and a weakened portion intermediate the threaded portion and one end of the connecting portion for permitting shearing and separation of the connecting portion from the threaded portion; the free end of the connecting portion having a flat portion and a part annular groove, whereby the connecting portion can be latched in a latching-type dental hand-piece to securely retain the dental anchoring device in the hand-piece without dropping therefrom and when said threaded portion is fully inserted in a bore said weakened portion shears to separate said connecting portion from said threaded portion.

*Id.* at Exh. A.

Figure 1, appendix, identifies different portions of the device. At the extreme far

3. The parties consolidated all the agreed facts (1–51) in one submission dated August 21, 1992 captioned: "Revised Local Rule 3(g) Statement of Material Facts Regarding Alleged Infringement by Defendants Sterling Optical Corp. and Coltene/Whaledent, Inc. as to which the Parties Agree there is no Genuine Issue to be Tried." For the purposes of this opinion, the Court refers to this submission as Revised Rule 3(g) Statement.

right, the shaded area (10) signifies a threaded portion, which has an outside diameter of 0.76 mm and a length of 4 mm. This threaded portion is then "formed integrally" with a connecting portion (11). The entire area comprising the connecting portion is designed as an elongated circular-cylindrical shank (12). One end of the shank is crafted with a cut-away area (13) and a groove configuration (14) so that the shank can latch into a dental handpiece. The other end of the shank, adjacent to the threaded portion, forms a conical shape (15). In between the threaded portion and the connecting portion, and jutting out from the tip of the cone, is a reduced diameter portion or weakened portion (16) that facilitates shearing or severing. '834 Patent, col. 1, 11. 28–47.

This embodiment of plaintiff's patent represents a pin that is formed from *one* piece of stainless steel wire. However, the patent also covers a second embodiment, in which "part of the connecting portion remote from the threaded portion is formed from a material different from that of the threaded portion and is *mo[ ]lded to the remainder of the pin to form an integral structure.*" *Id.* at col. 2, 11. 37–41 (emphasis added).[4]

As part of its submission to the PTO, the '834 patent outlines the procedure used in operating the anchoring device: (1) remove carious matter from the surface of a broken-down tooth, leaving a sound dentin understructure; (2) drill a hole in the dentin with a diameter slightly smaller than the threaded diameter of the anchoring device; (3) latch the anchoring device in a dental hand-piece and then operate the hand-piece so as to cause rotation of the anchoring device; (4) align and engage the anchor device with the hole and self thread the pin into the hole; (5) when the pin has reached the bottom or near bottom of the hole, the weakened portion will automatically sever and the connecting portion will be separated from the threaded portion; (6)

discard the excess threaded portion that remains in the handpiece; and (7) build up and around the tooth and the projecting threaded portion with amalgam or composite. *Id.* at col. 1, 1. 48—col. 2, 1. 10.

Based on the '834 patent, Fairfax markets in the United States a dental anchor pin, referred to by its trademark as the Stabilok pin ("Stabilok"). Initially, Stabilok pins were single piece metal pins sold in packages of twenty along with a twist drill. Revised Rule 3(g) Statement ¶ 40. Eventually, Fairfax began selling another form of Stabilok pin having a shank portion fused ultrasonically to the remainder of the pin. *Id.* ¶ 42.

### 2. The Prior Art

Self-threading, self-shearing, power-inserted dental anchor devices were first described in an article written by a Case Western Reserve professor of dentistry, Gerard Courtade. Gerard L. Courtade, *Pin pointers III Self-threading pins*, 20 J. of Prosthetic Dentistry 335 (Oct. 1968). On July 11, 1972 the PTO issued patent No. 3,675,328 ("the '328 patent"), naming Bernard Weissman ("Weissman") as inventor for a dental anchor device similar in substance to one examined in Courtade's article. Both the Courtade article and the '328 patent depict a dental anchor device consisting of two distinct features, a threaded pin and a chuck attachment. For example, in Figure 2, appendix, Courtade illustrates a dental pin (A) having a threaded portion and a weakened portion. Together with this pin, Courtade shows two alternative direct-drive chucks, a short version (1) and a long version (2). *Id.* at 337. The '328 patent and the Courtade article explain that the chuck attachment has an elongated shank with a circular cross-section. At one end, the chuck attachment is fashioned to allow for direct positive latching to a dental hand-piece. The other end of the chuck is equipped with gripping prongs, in order to

---

**4.** While including many illustrations of the first embodiment, the '834 patent does not show a depiction of the second embodiment. At oral argument, Whaledent asserted that the second embodiment was not part of the patent when it was first filed in the United Kingdom. According to Whaledent, Fairfax added the alternative embodiment in order to extend the patent's scope.

hold the manipulating head of the dental pin by friction fit. Revised Rule 3(g) Statement ¶ 17. Whaledent manufactures and sells a dental anchor device based on the prior art teachings of Courtade and the '328 patent, known as the Thread Mate System or T.M.S. pin ("TMS"). *Id.* ¶ 18.

Besides its purpose of anchoring a superstructure of restorative material to a tooth understructure, the prior art TMS anchor device is similar to plaintiff's Stabilok pin in consisting of three distinct portions. As shown in Figure 3, appendix, there is a threaded portion for self-threading insertion into a predrilled hole formed in a tooth dentin (1). In between the manipulating head of the pin which fits into the chuck's gripping prongs, there is a weakened portion (2) permitting shearing and separation just as with plaintiff's pin. Finally, the chuck attachment in the TMS device constitutes a connecting portion (3) analogous to the elongated circular-cylindrical shank formed out of one end of the Stabilok pin. *Id.* ¶ 17.

However, while plaintiff's Stabilok pin comes preassembled, the TMS device requires that dentists assemble the component parts and connect the chuck attachment to the dental pin. After inserting the pin into the chuck, the dentist must latch the chuck onto the powered dental handpiece. The free end of the dental pin is then guided to a channel or hole previously drilled in the patient's tooth, the handpiece is operated and the free end of the pin is engaged with the hole. Once the threaded portion is rotated into the hole, the pin's manipulating head is removed from the prongs of the chuck and discarded. The chuck attachment is available for reuse with other dental pins. *Id.*

Some of the professional literature, studying the use of dental reinforcing pins, highlights the potential safety problems with prior art TMS devices. For example, there is the possibility that while the dentist is maneuvering the pin before it has taken hold in the predrilled hole that the TMS pin will separate from the chuck attachment and fall into the patient's mouth. M.R. Dimashkieh, *Safety Applicator for Dental Pins and Screws,* 140 British Dental J. 215 (March 16, 1976). If a pin that inadvertently falls into a patient's mouth is swallowed or ingested, the patient may have to be hospitalized so that the object can be removed either through bronchoscopic methods or by surgery. Revised Rule 3(g) Statement ¶ 24. In contrast, Fairfax's Stabilok pin and defendants' pins are relatively safe since they are direct drive pins with little danger of dropping. R.B. Winstantley, *Pinned Retention—10 Years On,* Dental Update, May 1983, at 247, 250. Fairfax argues that another problem with the prior art pins is that they are relatively cumbersome and time consuming to use.

### 3. Whaledent's Accused Link Pin

Figure 4, appendix, depicts Whaledent's Link-type anchor device ("Link"), which is a device made up of two pieces, a plastic shank and a metal pin in friction fit. The two pieces are manufactured in the factory such that during use the metal pin will not inadvertently separate from the plastic shank and fall into the patient's mouth. The metal pin has a threaded portion, an end portion, and a weakened portion between the end portion and the threaded portion. The plastic shank has one end shaped for locking into a powered dental hand-piece and has at the other end a longitudinally extended opening into which the end portion of the pin section has been frictionally fitted in a manner permitting pivoting of the metal pin with respect to the plastic shank. Revised Rule 3(g) Statement ¶ 19.

The reason for a pivoting function is that toward the bottom of the longitudinal bore in the plastic shank, there is a diamond shaped cross-section. The end portion of the metal pin has a flattened section which is generally oval shaped. This oval section is a press fit within the diamond shaped portion, with the plane of the flattened section aligned between the opposite corners of the diamond. Due to the resilience of the plastic, the areas of the diamond shaped portion sidewall that were compressed during insertion of the oval section regain their original shape after the oval

section has moved out of engagement with such areas during assembly. This design retains the metal pin within the plastic shank and prevents rotation of the metal pin within the shank, while permitting pivoting of the pin. *Id.*

### 4. Filhol's Filpin

Similar to Whaledent's Link pin, Filhol manufactures a disposable dental anchor device consisting of a metal pin that is friction fit into a plastic adapter and known as the Filpin ("Filpin"). According to Filhol, friction fit means that the two pieces are fixed securely into each other as in the way a cork sits tightly in a wine bottle. Memorandum of the Filhol Defendants in Response to the Memoranda of Fairfax and Coltene/Whaledent at 2. A cork may be squeezed into a bottle opening but it is still loose enough to be pulled apart by hand. *Id.* at 11.

Figure 5, appendix, depicts the Filpin after the pin has been inserted into the shank. As with the Stabilok pin and the Link pin, there are three distinct portions: a threaded portion; a weakened portion; and a connecting portion. The difference between the Filpin and the Link pin is the way in which the pin fits into the shank. Whereas in the Link pin, the oval shape of the end of the pin presses up against the diamond configuration inside the shank, Filhol's filpin forms a zig zag configuration inside the shank that buttresses the pin to the shank.

### B. *Prosecution History*

#### 1. Proceedings in the PTO Before Issuance of the '834 Patent

The '834 patent has been evaluated, reviewed and reexamined by the PTO on numerous occasions over the last seventeen years. Andrew Smith first applied for a patent on December 9, 1975. Revised Rule 3(g) Statement Exh. B. The principal claim of his application read as follows:

A dental reinforcing pin comprising a threaded portion for self-tapping insertion in a bore formed in a tooth understructure and a connecting portion formed integrally therewith, the connecting portion including a shank capable of slidable insertion in a dental handpiece, and including a weakened portion intermediate the threaded portion and the connecting portion to permit shearing and separation of the connecting portion from the threaded portion.

*Id.* at 5. On June 9, 1976, however, patent examiner McNeill rejected Smith's attempt to obtain a patent, because the claims were obvious in view of the prior art, especially with respect to the '328 patent. *Id.* at 9. Thereafter, Smith amended claim 1 by specifying that the shank be "adapted for *locking directly* into a powered" dental handpiece. *Id.* at 15 (emphasis added). The proposed amendment explained that whereas in prior art devices the pin may slip out because it is not locked into the chuck, in Smith's device the pin is locked directly into the dental handpiece removing any danger of the pin inadvertently dropping into the patient's mouth and being inhaled or ingested. *Id.* at 18–19. Nevertheless, the PTO remained unconvinced and examiner McNeill issued a second denial of plaintiff's patent based on its obviousness in light of the prior art. *Id.* at 46–49. Subsequently, Smith submitted a Request for Reconsideration but this too was denied because it did not overcome the reasons for rejection. *Id.* at 118.

In June 1977, Smith filed a Continuation Application, which was also rejected on grounds of obviousness by a second patent examiner, Robert Peshock. *Id.* Exh C at 117–19. Relying on *In re Larson,* 340 F.2d 965 (CCPA 1965) (use of a one piece brake drum *integrally* with a clamping means was merely a matter of obvious engineering choice), examiner Peshock reasoned that it would have been obvious to make the chuck integral with the anchor rod. Revised Rule 3(g) Statement, Exh. C at 118. Once again, Smith filed a Request for Reconsideration arguing that it would not have been obvious to one skilled in the art to make the chuck integral with the pin. Referring to the Demashkieh article, Smith explained that because of the danger of a pin falling out of a chuck into the patient's mouth, the obvious procedure is to use a

pliers to tighten the prongs of the engaging slot and not to integrate the chuck with the pin. *Id.* at 127. Moreover, Smith attempted to distinguish his case from *In re Larson.* Smith maintained that in *Larson,* "the Court agreed that claiming the drum *integral* with the clamping means did not differ from the prior art which showed a brake disc *rigidly secured* to a clamping means, since 'integral' as defined in the dictionary encompassed such construction." *Id.* at 127–28 (emphasis in original). Yet, in the present case, Smith continued, "applicant's dental pin does differ from the prior art since the prior art does not show rigid securing of Weissman's ['328 patent] anchor and chuck." *Id.* at 128. After filing the Request for Reconsideration, Smith submitted a supplemental amendment that cancelled some claims and reformulated others. Of most importance, the one independent claim now qualified that the connecting portion has an elongated shank enabling direct positive attachment into the powered handpiece, but it did not include any limitation that the connecting portion form an integral unit with the threaded portion. *Id.* at 133–34. In March 1979, examiner Peshock rejected Smith's reexamination request along with the amendment. *Id.* at 249.

Subsequent to this denial, however, Smith requested and received an interview with examiner Peshock. At the interview, Smith represented to the PTO, through his own declaration and those of Eric Kenneth Joseph and Keith Vernon Mortimer, that before his invention, the obvious way to overcome the disadvantages of the TMS pin would have been to improve the connection between the metal pin and the chuck. As Mortimer declared: "Prior to learning of the Stabilok dentin[ ] pin ... I would have attempted to improve the connection between the tiny screw and ... the intermediate chuck member." *Id.* at 279. Based on the declarations, examiner Peshock reversed his earlier decision and offered to accept Smith's independent claim if it were rewritten to include the limitation that the connecting portion form an integral unit with the threaded portion. The claim now began to resemble what it would look like

in its final patentable form. It read in pertinent part: "A dental anchoring device comprising a threaded portion for [self-threading] insertion in a bore formed in a tooth dentin[ ], a connecting portion [forming an integral unit with said threaded portion] and having an elongated shank for direct positive attachment ..." *Id.* at 256. Finally, after numerous attempts at formulating and revising the scope of its claim, plaintiff succeeded in persuading the PTO to issue it a patent for its invention.

### 2. Reexamination Proceedings Before the PTO

After the issuance of the '834 patent, the claims were reexamined three times by the PTO. Each of these reexamination proceedings addressed the question whether prior art references, not considered by the PTO during the original prosecution, rendered the invention unpatentable. Revised Rule 3(g) Statement ¶ 11. Ultimately, all three of these proceedings resulted in confirming the patentability of plaintiff's claims. *Id.* ¶¶ 12–14. Nevertheless, as part of the third and final proceeding, the PTO Board of Patent Appeals and Interferences ("the Board") asked examiner Peshock to clarify the term "integral" in the '834 patent. The Board wrote:

> It would be helpful to the Board, in evaluating the secondary considerations, if the examiner would focus on the scope of the term "integral" in claim 1 of the patent and give us his understanding of the term ... Is the term 'integral' used in patent claim 1, sufficiently broad to include the force fit pivotable arrangement of Wiseman [sic, Weissman] '101, and *if so how does the term "integral"* distinguish the frictional inner connection between the chuck ... and the threaded pin ... of Wiseman [sic, Weissman] '328."

*Id.* Exh. G at 871–72.

Seeking to convince the PTO *to read on the patent a broad definition* of "integral," Fairfax drafted a letter dated December 15, 1989 in which it argued that the file history of the patent clarifies the meaning of the term. Specifically, plaintiff asserted

that "integral unit" refers to *any* pin in which a "connecting portion is linked to its threaded portion in the course of manufacture in the factory so that the pin can be used by the dentist without assembly of the components ..." *Id.* at 876. As such, plaintiff envisioned a definition of "integral" that covered not only the designs Smith submitted to the PTO with his patent, but those submitted by defendants as well.

> Thus, the pin could be formed from one homogenous piece of material as in the embodiments depicted in the drawings of the patent under reexamination. Equally well, it could be molded of two dissimilar pieces of material, *or it could be manufactured of two pieces of material which are force fitted together, frictionally held together, or held together in any way,* so long as the threaded portion cannot inadvertently detach from the connecting portion as the pin is being maneuvered in the patient's mouth.

*Id.* at 876–77 (emphasis added).

The PTO, however, did not read "integral" as broadly as plaintiff. Because examiner Peshock died before addressing the remand, a new patent examiner, John Wilson, issued a response. On May 22, 1990 Wilson concluded: "Interpreting the term 'integral' in light of the disclosure, the term is held to mean one-piece or two different materials molded together. *It is clear that the reference to Courtade, which shows two separate pieces in friction fit, does not anticipate the claims."* *Id.* at 937 (emphasis added). According to the PTO, therefore, plaintiff's patent does not cover a two piece frictionally fitted pin, as depicted in Courtade and the '328 patent. In August 1990, the PTO confirmed the patentability of plaintiff's claims and terminated the reexamination proceedings. *Id.* at 940.

## DISCUSSION

### A. *The Standards for Summary Judgment*

A motion for summary judgment may be granted in patent cases as in other areas of litigation. *Continental Can Co. v. Mon-*

*santo Co.,* 948 F.2d 1264, 1265 (Fed.Cir. 1991); *Spectra Corp. v. Lutz,* 839 F.2d 1579, 1581 n. 6 (Fed.Cir.1988). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1387 (Fed.Cir.1992).

The party moving for summary judgment bears the burden of demonstrating the basis for its motion and of identifying the documents and materials necessary to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552–53; *Laitram Corp. v. NEC Corp.,* 952 F.2d 1357, 1362 (Fed.Cir.1991). A nonmovant may then attempt to raise the existence of a genuine issue of fact, but he must demonstrate more than a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1560 (Fed.Cir.1988). In deciding the motion, however, the court will resolve ambiguities and draw all reasonable inferences against the moving party so that the evidence is viewed in a light most favorable to the nonmovant. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962); *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d at 1560. The Judge's function is not to resolve disputed issues of fact or determine the truth of the matter but to assess whether there exists a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2135, 91 L.Ed.2d 202 (1986).

The instant cross-motions were submitted upon a set of stipulated facts and so the Court's role is to determine whether either party has failed to make a sufficient showing on essential elements of its case.

*Celotex Corp. v. Catrett* 477 U.S. at 323, 106 S.Ct. at 2552. When a party fails to meet an essential part of the applicable legal standard, no genuine issue of material fact exists and all other facts are rendered immaterial. *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1537 (Fed. Cir.1991). The Court now examines whether Fairfax's proof satisfies the legal standards for patent infringement or whether Whaledent establishes a case for noninfringement.

### B. *Patent Infringement*

#### 1. Infringement—In General

■ Patent infringement analysis is a two stage process. First, a court assesses the meaning and scope of each claim. Second, the court compares the two devices to determine if the claims can be read on the accused structure. *Symbol Technologies, Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1574 (Fed.Cir.1991). Interpreting claims consists of closely examining the claim language, the patent specification, and the prosecution history. *Lemelson v. General Mills, Inc.*, 968 F.2d 1202, 1206 (Fed.Cir. 1992). Prosecution history will often be instrumental in deciphering the meaning and scope of claims, because it can clarify what the original application sought and what had to be added or deleted in order to comply with PTO objections. "Prosecution history is especially important when the invention involves a crowded art field, or when there is particular prior art that the applicant is trying to distinguish." *Id.* As recounted above, Fairfax spent over a decade convincing the PTO that its pin was different from the prior art. Therefore, this Court places great weight on the prosecution history in determining the meaning and scope of the '834 patent.

■ In comparing the accused device to the patented item, courts first look to see if there has been literal infringement. Literal infringement occurs when the accused device embodies each element and limitation of the patent claims as properly interpreted. *Jurgens v. McKasy*, 927 F.2d 1552, 1560 (Fed.Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 281, 116 L.Ed.2d 232 (1991). "In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it." *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950). The parties in the instant matter have stipulated that Whaledent's Link pin does not literally infringe the '834 patent, because the PTO construed the term "integral" to mean that the threaded portion and the connecting portion are formed of one piece or of two different materials molded together. Revised Rule 3(g) Statement ¶ 22. Plaintiff submits, however, that even in the absence of literal infringement, the Court should find infringement through application of the equitable doctrine of equivalents.

#### 2. Infringement Under the Doctrine of Equivalents: The Substantiality Test

■ Recognizing the potential for imitators to evade patent claims by making slight and insubstantial changes to patented devices, early American courts formulated the equitable doctrine of equivalents. *Charles Greiner & Co. v. Mari–Med Mfg., Inc.*, 962 F.2d 1031, 1036 (Fed.Cir.1992) (charting the history and evolution of the doctrine of equivalents). Under this doctrine, variations to a patented item can be infringing if the copy misappropriates the essence of the invention. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. at 608, 70 S.Ct. at 856. As the Supreme Court explained when it adopted this doctrine:

> Where form and substance are inseparable, it is enough to look at the form only. Where they are separable; where the whole substance of the invention may be copied in a different form, it is the duty of the courts and juries to look through the form for the substance of the invention—for that which entitled the inventor to his patent, and which the patent was designed to secure; where that is found there is an infringement; and it is not a defence, that it is embodied in a form not

described, and in terms claimed by the patentee.
*Winans v. Denmead,* 56 U.S. (15 How.) 330, 346, 14 L.Ed. 717 (1853).

The modern standards for applying the doctrine of equivalents were established in *Graver Tank,* which introduced a three part test, finding infringement when an accused device performs substantially the same function in substantially the same way to achieve substantially the same result (the "substantiality test"). *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. at 608, 70 S.Ct. at 856; *London v. Carson Pirie Scott & Co.,* 946 F.2d at 1539. *Graver Tank* reasoned that if insignificant changes were not subject to patent infringement, not only would substance be subordinated to form, but the patentee would be deprived of the benefit of his innovation and would be forced to conceal his invention rather than to disclose it. *Graver Tank & Mfg. Co. v. Linde Air Products Co.* 339 U.S. at 607, 70 S.Ct. at 855–56. Recently, the Federal Circuit reaffirmed the *Graver Tank* rationale:

> [T]he patentee should not be deprived of the benefits of his patent by competitors who appropriate the essence of an invention while barely avoiding the literal language of the claims ... Although designing or inventing around patents to make new inventions is encouraged, piracy is not. Thus, where an infringer, instead of inventing around a patent by making a substantial change, merely makes an insubstantial change, essentially misappropriating or even "stealing" the patented invention, infringement may lie under the doctrine of equivalents.

*London v. Carson Pirie Scott & Co.,* 946 F.2d at 1538. In short, the doctrine of equivalents aims to prevent fraud on a patent. *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. at 608, 70 S.Ct. at 856.

While infringement by the equivalents ensures fair and significant protection to a patented invention, the doctrine conflicts with other, equally important policies of patent law. Patent law features a claiming system that provides the public with notice as to which inventions are protected and which remain part of the public domain. Claims measure and define patents. By extending the scope of patent protection beyond the literal claims, the doctrine of equivalents undermines the primacy of claims. Judge Learned Hand explained that the doctrine of equivalents is anomalous to patent law, because its "latitude violates in theory the underlying and necessary principles that the disclosure is open to the public save as the claim forbids, and that it is the claim and that alone which measures the monopoly." *Claude Neon Lights, Inc. v. E. Machlett & Son,* 36 F.2d 574, 575 (2d Cir.1929), *cert. denied,* 281 U.S. 741, 50 S.Ct. 347, 74 L.Ed. 1155 (1930). Dissenting in *Graver Tank,* Justice Black admonished that a patent claim should not be manipulated like a nose of wax turned and twisted in any direction. Justice Black was emphatic: "[w]hat is not specifically claimed is dedicated to the public ... the function of claims ... is to exclude from the patent monopoly field all that is not specifically claimed, whatever may appear in the specifications." *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. at 614, 70 S.Ct. at 859 (Black, J., dissenting). Only recently, Judge Lourie of the Federal Circuit reasserted that staying within the parameters of the claim is paramount in patent law:

> Application of the doctrine of equivalents is the exception, however, not the rule, for if the public comes to believe (or fear) that the language of patent claims can never be relied on, and that the doctrine of equivalents is simply the second prong of every infringement charge, regularly available to extend protection beyond the scope of the claims, then claims will cease to serve their intended purpose. Competitors will never know whether their actions infringe a granted patent.

*London v. Carson Pirie Scott & Co.,* 946 F.2d at 1538.

Because infringement by the equivalents fundamentally conflicts with the policy that claims define and measure the patent, the Federal Circuit has increasingly interpreted and applied the doctrine more restrictively. *Texas Instruments, Inc. v. United States*

*Int'l Trade Comm'n,* 805 F.2d 1558, 1572 (Fed.Cir.1986) ("The determination of equivalency by its nature is inimical to the basic precept of patent law that claims are the measure of the grant."). Most noteworthy, in *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931 (Fed.Cir.1987), *cert. denied* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988), the Federal Circuit, sitting *in banc,* announced that in analyzing infringement under the doctrine of equivalents, courts should apply an element by element approach. To determine whether the accused device is an equivalent of the patent, each element of the patent claim must be found within the allegedly infringing device. According to *Pennwalt,* "each element of a claim is material and essential, and ... in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *Id.* at 935 (quoting *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.,* 822 F.2d 1528, 1533 (Fed.Cir.1987) (quoting *Lemelson v. United States,* 752 F.2d 1538, 1551 (Fed.Cir.1985))); *see also Becton Dickinson and Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 798 (Fed.Cir.1990) ("Only if all limitations of the claim are satisfied at least equivalently can it be found that the two devices work 'in substantially the same way.' "). Consistent with *Pennwalt,* in order for Fairfax to prevail on a claim of infringement under the doctrine of equivalents, it would have to show that every element of its claims is found within defendants' pins.[5]

■ There are definite similarities between defendants' pins and plaintiff's patent. All are constructed in three distinct portions: a threaded portion; a weakened portion; and a connecting portion. However, defendants' pins are not built with the critical limitation defining plaintiff's de-

vice—that is, the requirement that the connecting portion form an integral unit with the threaded portion. The connecting portion and the threaded portion have to be either of one piece or of two pieces molded together. In contrast, defendants' pins are connected by friction fit to a separate plastic shank.

While both Fairfax's pin and Whaledent's pin may make the use of dental anchoring devices much easier and safer than prior art pins, there are differences in the manner in which they are used. In particular, Whaledent's Link pin is able to pivot so that a dentist may more adeptly align the pin with the drilled hole in which it is being inserted. Without this pivoting feature, dentists, when lining up the longitudinal axis of the anchor with the longitudinal axis of the hole, are more likely to fracture the tooth by boring a second hole. Such a difference presents no subtle distinction, but even if the pivoting component of the Link pin were only a slight improvement, this little improvement is sufficient to preclude a finding of infringement. In *Universal Gym Equipment, Inc. v. EWRA Exercise Equipment Ltd.,* 827 F.2d 1542, 1548 (Fed.Cir.1987), two exercise equipment machines were found to function differently simply because one had a rigid arm while the other's arm pivoted. The court held that even though the two machines achieved the same result, there could be no infringement under the doctrine of equivalents as the machines did not perform in substantially the same way.

The fact that the two devices achieve substantially the same result creates no presumption that they do so in substantially the same way ... The patentee has the burden of proof to show that the accused device infringes the patent claims, and to do so under the doctrine of

---

5. Prior to *Pennwalt,* some Federal Circuit cases had found infringement when the accused device viewed in its entirety had been compared to the claimed invention as a whole. As these cases understood the doctrine of equivalents, "the fact finder must determine the range of equivalents ... It must then be determined whether the *entirety* of the accused device or process is so 'substantially the same thing ...' " *D.M.I.; Inc. v. Deere & Co.,* 755 F.2d 1570, 1575

(Fed.Cir.1985) (emphasis added) (quoting *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 610, 70 S.Ct. 854, 857, 94 L.Ed. 1097 (1950)). *See also Martin v. Barber,* 755 F.2d 1564, 1568 (Fed.Cir.1985) ("To determine whether ... equivalent, the fact finder must decide whether the components ... viewed as a whole, operate in substantially the same way, and have substantially the same function and result, as the claimed invention.").

equivalents requires a showing that all three components of the equivalency test are met.

*Id.*

3. Limitations to the Doctrine of Equivalents

a) *The Prior Art Limitation: The Hypothetical Claim Test*

■ Even had the strict substantiality test been met, plaintiff would not be allowed to assert an equivalency claim because two limitations on the doctrine of equivalents preclude its application in this case. Under the first limitation, the range of equivalents cannot be so broad as to encompass the prior art. *Senmed, Inc. v. Richard–Allan Medical Indus., Inc.*, 888 F.2d 815, 821 (Fed.Cir.1989). "[A] patentee should not be able to obtain, under the doctrine of equivalents, coverage which he could not lawfully have obtained from the PTO by literal claims." *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*, 904 F.2d 677, 684 (Fed.Cir.1990). In the same way prior art limits what inventors are allowed to claim, it limits the range of permissible equivalents as well.

■ *Wilson Sporting Goods* developed a "hypothetical claim" test for conceptualizing the prior art limitation on the scope of equivalents. This test entails

visualizing a *hypothetical* patent claim, sufficient in scope to *literally* cover the accused product. The pertinent question then becomes whether that hypothetical claim could have been allowed by the PTO over the prior art. If not, then it would be improper to permit the patentee to obtain that coverage in an infringe-

ment suit under the doctrine of equivalents. If the hypothetical claim could have been allowed, then *prior art* is not a bar to infringement under the doctrine of equivalents.

*Id.* (emphasis in original). Under the hypothetical claim test, the plaintiff, Fairfax, assumes the burden of proving that the range of equivalents to the '834 patent not ensnare the prior art. *Id.* at 685. Subsequently, in *We Care Inc. v. Ultra–Mark International Corp.*, 930 F.2d 1567, 1571 (Fed.Cir.1991), the Federal Circuit added a second component to the hypothetical claim test. Plaintiff must demonstrate not only that a hypothetical claim covering the accused device would not be anticipated by the prior art, but also that such claim would not be obvious over the prior art.

■ Fairfax provides a hypothetical claim that, it asserts, covers defendants' pins but differs from the prior art. This claim is identical to claim 1 of the '834 patent except that it deletes the statement "forming an integral unit with said threaded portion," and adds the clause, "said threaded portion and said connecting portion being manufactured in the factory as a complete device such that during use said threaded portion will not inadvertently separate from said connecting portion and fall into the patient's mouth." [6] Fairfax argues that while every component of the hypothetical claim exists in defendants' pins, none of the prior art shows or makes obvious a dental anchoring device in which the threaded portion and the connecting portion are manufactured in the factory as a complete device such that during use the threaded portion will not inadvertently sep-

---

6. The hypothetical claim provides:

A dental anchoring device comprising a threaded portion for self-threading insertion in a bore formed in a tooth dentin[ ], a connecting portion ... having an elongated shank adapted for direct positive attachment in a powered dental hand-piece, and a weakened portion intermediate the threaded portion and one end of the connecting portion for permitting shearing and separation of the connecting portion from the threaded portion; the free end of the connecting portion having a flat portion and a part annular groove, [said threaded portion and said connecting portion being manufactured in the factory as a com-

plete device such that during use said threaded portion will not inadvertently separate from said connecting portion and fall into the patient's mouth,] whereby the connecting portion can be latched in a latching-type dental handpiece to securely retain the dental anchoring device in the hand-piece without dropping therefrom and when said threaded portion is fully inserted in a bore said weakened portion shears to separate said connecting portion from said threaded portion.
Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment of Infringement at 26.

**338**

arate from the connecting portion and fall into the patient's mouth. According to plaintiff, the hypothetical claim is patentable because it offers over the prior art the advantages of speed and safety found in preassembled pins. Therefore, Fairfax concludes, the doctrine of equivalents is applicable to this case because the hypothetical claim could have been allowed by the PTO over the prior art.

This Court disagrees. The hypothetical claim transforms the '834 patent into a "product-by-process" patent in which the product is defined, at least in part, in terms of the method or process by which it is made. 2 Donald Chisum, *Patents* § 8.05 (1991). Recently, in *Atlantic Thermoplastics Co. v. Faytex Corp.*, 970 F.2d 834 (Fed.Cir.1992), the Federal Circuit reviewed the history and caselaw of product-by-process claims and reaffirmed that a patentee who does not distinguish his product from the prior art, except in the manner by which he produced it, will not secure exclusive patent rights. *See General Electric Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 373, 58 S.Ct. 899, 903, 82 L.Ed. 1402 (1938). "Even though product-by-process claims are limited by and defined by the process, determination of patentability is based on the product itself ... The patentability of a product does not depend on its method of production." *In re Thorpe*, 777 F.2d 695, 697 (Fed.Cir.1985) Fairfax asserts that the hypothetical claim would be patentable over the prior art primarily because the pin is wholly manufactured and assembled in the factory as a complete device. That the dental pin in Fairfax's hypothetical claim is "manufactured in the factory as a complete device" is not sufficient to make the claim patentable.

▬ Further, the hypothetical claim is unpatentable because it bases the invention exclusively on results rather than structural elements. Patent law recognizes that function alone is not enough to secure a patent because technological advancement

may provide other devices capable of performing the same function. *Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1, 12, 67 S.Ct. 6, 12, 91 L.Ed. 3 (1946). Fairfax's hypothetical claim adds only functional language to the '834 patent. Through the Fairfax device, the threaded portion will not inadvertently separate from the connecting portion and the pin will not fall into the patient's mouth. However, inadvertent separation could also be avoided by pinching together the threaded portion and the prior art TMS chuck. In this respect, the hypothetical claim language clearly would be so broad as to encompass the prior art.

Indeed, Fairfax emphasized during the prosecution history that if one were confronted with a separating pin and chuck in the prior art designs, the obvious improvement would be, as the Demashkieh article explained, to use a pliers to tighten the prongs of the engaging slot and not to integrate the chuck with the pin. Revised Rule 3(g) Statement, Exh. C at 127. Now, Fairfax wants this Court to ignore that representation and to include as an equivalent any device in which the connection between the threaded portion and the connecting portion is so tight that the pin will not fall out. In light of *We Care*, Fairfax is precluded not only from a hypothetical claim which reads directly on the prior art, but also from a hypothetical claim which would have been obvious.

### b) *The Doctrine of Prosecution History Estoppel*

▬ The second limitation on the doctrine of equivalents is currently known as the doctrine of prosecution history estoppel.[7] *Charles Greiner*, 962 F.2d at 1036. If an applicant obtains a patent by narrowing his claims in the PTO so as to distinguish his device from the prior art, he may not subsequently attempt to recapture what he gave up by invoking the doctrine of equivalents. *Smith v. Magic City Ken-*

---

7. The doctrine of prosecution history estoppel was traditionally referred to as file wrapper estoppel. The file wrapper is the record of proceedings in the PTO and refers specifically to the jacket holding all papers filed in connection

with a particular patent application. *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452 (Fed.Cir.1985); 4 Donald S. Chisum, *Patents* § 18.05 at 18–151 (1992). The Federal Circuit now prefers prosecution history estoppel.

*nel Club, Inc.,* 282 U.S. 784, 789, 51 S.Ct. 291, 293, 75 L.Ed. 707 (1931); *Biodex Corp. v. Loredan Biomedical, Inc.,* 946 F.2d 850, 862 (Fed.Cir.1991). In other words, a patentee is estopped from using the doctrine of equivalents when his patent was accepted by the PTO based on language excluding the allegedly equivalent device. Patent cases consistently refer to the Supreme Court's description of the doctrine in *Smith v. Magic City Kennel Club:*

> [W]here an applicant for a patent to cover a new combination is compelled by the rejection of his application by the Patent Office to narrow his claim by the introduction of a new element, he cannot after the issue of the patent broaden his claim by dropping the element which he was compelled to include in order to secure his patent ... Whether the examiner was right or wrong in rejecting the original claim, the court is not to inquire ... limitations imposed by the inventor, especially such as were introduced into an application after it had been persistently rejected, must be strictly construed against the inventor and looked upon as disclaimers. The patentee is thereafter estopped to claim the benefit of his rejected claim or such a construction of his amended claim as would be equivalent thereto.

*Smith v. Magic City Kennel Club, Inc.,* 282 U.S. at 789–90, 51 S.Ct. at 293–94 (citations omitted).

Thus in analyzing a question of infringement by the equivalents, the Court recognizes that the doctrine of equivalents is subservient to the doctrine of prosecution history estoppel. *Uniroyal Inc. v. Rudkin–Wiley Corp.,* 939 F.2d 1540, 1544 (Fed. Cir.1991). "[W]here a patentee has narrowed his claim, in order to escape rejection, he may not ... resort to the doctrine of equivalents ..." *Smith,* 282 U.S. at 790, 51 S.Ct. at 294. "[P]rosecution history estoppel, which precludes a patentee from obtaining a claim construction that could resurrect subject matter surrendered during prosecution of his patent application ... limits a patentee's reliance on the doctrine of equivalents ..." *Thomas & Betts Corp. v. Litton Systems, Inc.,* 720 F.2d

1572, 1579 (Fed.Cir.1983). In fact, because this principle is so well established, courts frequently rely upon it in granting summary judgment for noninfringement in patent cases where there is no genuine issue concerning the operative material facts. For example, in *Builders Concrete, Inc. v. Bremerton Concrete Products Co.,* 757 F.2d 255 (Fed.Cir.1985), the Federal Circuit reaffirmed a grant of summary judgment in that there was no literal infringement and the doctrine of prosecution history estoppel precluded a patentee from recapturing scope for a claim relinquished during prosecution in order to obtain the patent. The doctrine of prosecution history estoppel promotes certainty and clarity in determining the scope of patent rights. *Charles Greiner,* 962 F.2d at 1036.

■ In the instant matter, the prosecution history certainly clarified the scope of the '834 patent. Fairfax represented to the PTO, during the lengthy prosecution history, that its device differed from the prior art in that its component portions were rigidly secured to each other. Thus, when the PTO finally approved plaintiff's patent, it insisted that the claim limit the scope to a device in which the connecting portion formed an integral unit with the threaded portion. Moreover, upon reexamination, the patent examiner defined integral as meaning made of one piece or of two pieces molded together and determined that a device in which two pieces are connected by friction fit is *not* covered by the claim. Now, Fairfax wants this court to perform an about face and declare that defendants' devices which are non-rigid and friction fitted constitute equivalents of the claimed dental pin. Prosecution history estoppel prevents Fairfax from recapturing what it relinquished in order to obtain a patent over the prior art.

In asking this court to find infringement under the doctrine of equivalents by ignoring the prosecution history, Fairfax employs Orwellian logic. George Orwell's *1984* depicts a world in which history is concurrently made and revised based on the exigencies of the moment. At one moment history will record that a given event

**340**

took place, while only a second later history can do an about face and declare that the event did not occur. Orwell referred to this type of logic as "doublethink":

> [T]o hold simultaneously two opinions which cancelled out, knowing them to be contradictory and believing in both of them, to use logic against logic ... to forget whatever it was necessary to forget, then to draw it back into memory again at the moment when it was needed, and then promptly to forget it again.

George Orwell, *1984* 32–33 (Signet Classics ed., Penguin Books 1981) (1949). This Court will not engage in doublethink. It will not temporarily forget the PTO's reading of integral as referring to one piece or two pieces of material molded together so that defendants' pins can be held to have infringed plaintiff's patent.

### CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment on infringement is denied, and defendant Whaledent's cross-motion for summary judgment on non-infringement is granted.

Settle judgment on notice.

## APPENDIX

# Figure 1

# Figure 2

# Figure 3

# Figure 4

# Figure 5

## FILPIN
## (AFTER
## ASSEMBLY)

ANNULAR GROOVE

CONNECTING
PORTION

ELONGATED
SHANK

WEAKENED PORTION

THREADED
PORTION