**HYDRAFLOW, Plaintiff and Counterclaim–Defendant,**

v.

**ENIDINE INCORPORATED, Defendant and Counterclaim–Plaintiff.**

No. 88–CV–1120S.

United States District Court, W.D. New York.

Nov. 7, 1995.

Richard T. Sullivan, Sullivan, Benatovich, Oliverio & Trimboli, Buffalo, NY, for plaintiff.

Paul I. Perlman, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, NY, for defendant.

## DECISION AND ORDER

### *INTRODUCTION*

SKRETNY, District Judge.

Before this Court are the parties' cross-motions for partial summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff filed this action on October 13, 1988, alleging that defendant has infringed its patent for "snubbers" in violation of 35 U.S.C. § 271, and engaged in unfair competition. Plaintiff seeks a permanent injunction and damages. Defendant has asserted counterclaims for a declaratory judgment of invalidity and non-infringement, libel and/or slander per se, and tortious interference with contract. This Court has jurisdiction of the subject matter of this action under 28 U.S.C. §§ 1331, 1332, and 1338.

Defendant moves for summary judgment dismissing plaintiff's patent infringement claim on the ground that defendant has not infringed plaintiff's patent, either literally or by equivalents, as a matter of law.[1] Plaintiff

---

1. The parties have made extensive submissions on these motions. Defendant, in support of its motion for partial summary judgment, has submitted a memorandum of law ("D.Memo"), with exhibits; a reply memorandum of law ("D.R.Memo"); a statement of fact pursuant to

has filed two separate summary judgment motions. It seeks summary judgment in the first motion dismissing defendant's second and third counterclaims.[2] In the second motion plaintiff seeks summary adjudication that the claim at issue in plaintiff's patent does not exclude certain structures from its coverage.[3] Oral argument was heard January 25, 1995.

For the reasons set forth below, this Court will (1) grant defendant's motion for summary judgment; (2) grant plaintiff's motion for summary judgment dismissing defendant's second and third counterclaims; and (3) deny plaintiff's motion for summary judgment with respect to coverage of the claim at issue in its patent.

### FACTS

This is a patent infringement action. Plaintiff, Hydraflow, a California corporation ("Hydraflow"), alleges that defendant, Enidine Incorporated, a New York corporation ("Enidine"), infringed its patent for "snubber" rate control devices. Hydraflow and Enidine both produce snubbers. A snubber is a small hydraulic device installed in commercial aircraft overhead storage bins to control the rate at which the bin doors open and close. As the background in the patent in issue explains, "[t]he use of a snubber ... on an overhead storage bin door in an aircraft passenger compartment insures that the bin door will open at a controlled rate and will not unexpectedly drop on a passenger's head." (Ralabate Aff. ¶ 2, exh. 1; P2. Facts, exh. E.)

The patent in issue is United State Patent No. 3,999,745 (" '745 patent" or "Mahoff '745"), which Hydraflow owns. The patent issued on December 28, 1976, and expired on December 28, 1993. (Ralabate Aff. ¶ 2, exh. 1; P2. Facts, exh. E.) The '745 patent concerns a seal assembly for snubber devices. Hydraflow charges that the seal assembly in Enidine's snubber infringes this patent.

### A. *Events Giving Rise to this Action*

From approximately 1976 to 1986, Hydraflow supplied snubbers to The Boeing Co. ("Boeing") for installation in airplanes Boeing manufactured. (P2. Facts, exh. F.) Hydraflow learned on August 4, 1986, that Boeing had awarded a contract for snubbers to Enidine, not Hydraflow. (Perlman2 Aff. ¶ 2, exh. 1, p. 170; P2. Facts, exh. F.) In March 1987, a Boeing engineer told the president of Hydraflow, L.E. Ullrich, that the Enidine snubber had the same seal design to prevent leaking as the Hydraflow snubber. (Perlman2 Aff. ¶ 2, exh. 1, p. 146.) The '745 patent's background explains the problem of leakage in snubbers:

> Previously, considerable difficulty had been encountered in sealing snubber devices in which silicone fluid was used. Leakage of snubber devices in passenger compartments of aircraft resulted in irreversibly staining clothing, luggage, and other personal articles.... These and other difficulties of the prior art have been overcome according to the present invention wherein a seal assembly is provided in which a simple, efficient, compact, lightweight, and reliable seal assembly effec-

the Local Rules for the Western District of New York ("D.Facts"); the affidavit of Paul I. Perlman ("Perlman Aff."), with exhibits; the affidavit of Brian Bucholtz ("Bucholtz Aff."), with an exhibit; the affidavit of John Eleftherakis ("Eleftherakis Aff."), with exhibits; and the affidavit of James Ralabate ("Ralabate Aff."), with an exhibit. In opposition to defendant's motion, plaintiff has submitted a memorandum of law ("P.Memo"); a statement of issues of fact ("P.Facts"); and the declaration of Andres Soom ("Soom Dec.").

**2.** In support of this motion, plaintiff has submitted a memorandum of law ("P1. Memo"); a reply memorandum of law ("P1. R.Memo"); and a statement of facts ("P1. Facts"), with exhibits.

In opposition to plaintiff's motion, defendant has submitted a memorandum of law ("D1. Memo") and the affidavit of Paul I. Perlman ("Perlman1 Aff."), with exhibits.

**3.** In support of this motion, plaintiff has submitted a memorandum of law ("P2. Memo"); a reply memorandum of law ("P2. R.Memo"); a statement of uncontroverted facts ("P2. Facts"); a declaration of Bruce A. Jagger ("Jagger2 Dec."), with exhibits; and a reply declaration of Bruce A. Jagger ("Jagger2 R.Dec."), with exhibits. In opposition to this motion, defendant has submitted a memorandum of law ("D2.Memo") and the affidavit of Paul I. Perlman ("Perlman2 Aff."), with exhibits.

tively provides for the sealing of a snubber in both active and inactive operating conditions.

(Ralabate Aff. ¶ 2, exh. 1, Col. 1, lines 41–64; P2. Facts, exh. E., Col. 1, lines 41–64.) Boeing engineers showed Ullrich large-scale drawings of the Enidine device, pointing out its seal assembly. (P2. Facts, exh. G, pp. 165–66.) Ullrich sent Boeing a letter dated April 8, 1987, stating that Enidine's "product is a direct infringement of our patent 3,999,-745. . . . We notified Enidine . . . to cease manufacturing. . . ." (P2. Facts, exh. F.) By letter dated June 5, 1987, Enidine's general counsel informed Hydraflow that "Enidine's product in no way infringes upon your client's U.S. Patent No. 3,999,745." Enidine had received an opinion letter dated April 22, 1987, from its patent counsel stating that "patent 3,999,745 is not infringed by the Enidine actuator/rate control device." (P2. Facts, exh. H.) The June 5th letter expressed "very serious" concern that Hydraflow told Boeing in the April 8th letter that there "appears to be an infringement." (P2. Facts, exh. H.)

Hydraflow prepared a test report of the Enidine seal assembly dated October 9, 1987. (P2. Facts, exh. I.) The test report "presents the results of a test conducted on an elastomeric seal and a seal actuating element that were removed from an Enidine, Inc. actuator." (P2. Facts, exh. I, p. 1A.) The report, according to Hydraflow, supports the claim that the Enidine snubber infringed the '745 patent (P2. Facts, p. 5), a result

Enidine disputes (Perlman2 Aff. ¶ 10). In January or February 1988, Bruce A. Jagger, Hydraflow's patent counsel, met with Ullrich and James Hamley, Boeing's patent counsel. Jagger told Hamley that he thought the Enidine device infringed the '745 patent, and gave him a copy of the test results. (Perlman2 Aff. ¶ 11, exh. 2, pp. 11–14; P2. Facts, exh. J, pp. 11–14.)

Enidine's general counsel sent Hydraflow's counsel a letter dated April 22, 1988, expressing concern that Hydraflow had again alleged to Boeing that Enidine was infringing Hydraflow's patent. Enidine's counsel enclosed a second opinion from its patent counsel that the Enidine snubber did not infringe the '745 patent. (P2. Facts, exh. K.) Hamley sent Hydraflow's counsel a letter dated April 27, 1988, stating that "[a]fter a careful review with Boeing Engineering it was our conclusion that the submitted data was inconclusive on the issue of infringement." (P2. Facts, exh. M.) Hydraflow filed the instant action for patent infringement against Enidine in October 1988.

## B. *The '745 Patent and the Enidine Snubber Device*

The '745 patent includes four claims. Hydraflow charges that the seal assembly in the Enidine snubber infringed only Claim 1 of the patent. (D.Memo, p. 12; P2. Memo, p. 5.) A description in some detail of the '745 patent and accused Enidine device follows.

Fig. 1.

Fig. 2.

Fig. A

### 1. *The '745 Patent*

A snubber, as already explained, is a hydraulic device installed primarily in commercial aircraft overhead storage bins to control the rate at which the bin doors open and close. Figure 1 of the '745 patent shows a snubber indicated generally at **10** which includes a cylinder adapted to contain an hydraulic fluid and to receive axially for axial movement a cylindrical rod **14** [see Figure 2]. Cylinder **12** is provided with an eye **16** which is adapted for attachment to an adjacent structure. Rod **14** [see Figure 2] is provided with an eye **18** which is likewise adapted for attachment to an adjacent structure. The cylinder **12** is adapted to contain an hydraulic fluid. The hydraulic fluid is retained within the cylinder **12** by means of a seal assembly **20**. A variable orifice valve **22** is attached to and moves with rod **14** [see Figure 2]. The valve produces a snubbing (retarding) force by restricting the flow of fluid through its orifice. The size of the orifice varies in an inverse proportion to the load applied, maintaining thereby a relatively constant time cycle for a wide range of applied loads.

(Ralabate Aff. ¶ 2, exh. 1, Col. 3, lines 1–17; P2. Facts, exh. E, Col. 3, lines 1–17.)

Figure 2 of the '745 patent provides a sectional view of the seal assembly. The background of the patent explains that

> [t]he present invention provides a seal assembly in which a single, integral, annular wedging element applies radial loads to the inner and outer lips of a seal in such a way that the loads applied to the respective sealing lips are applied uniformly around the circumference of the individual lips, but as between the two lips the loads are proportioned so that the inner lip on the dynamic side of the seal receives a greater load than the outer lip on the stationary side of the seal.

(Ralabate Aff. ¶ 2, exh. 1, Col. 2, lines 45–53; P2. Facts, exh. E, Col. 2, lines 45–53.) Figure 2 illustrates the wedge **42**; the inner sealing lip **60**, adjacent to the cylindrical rod **14**; and the outer sealing lip **64**, adjacent to the wall of the cylinder **12**. As the background also explains, "[t]he radial loads are applied to the seal through the action of a separate annular integral wedging element which projects in wedging relationship between the sealing lips. The wedging element is urged into contact with the seal by a helical compression spring." (Ralabate Aff. ¶ 2, exh. 1, Col. 2, lines 29–33; P2. Facts, exh. E, Col. 2, lines 29–33.) Figure 2 illustrates the annular wedge in contact with both the inner and outer sealing lips.

### 2. *The Accused Device*

The accused device is the seal assembly of the Enidine snubber. The Enidine snubber is also a hydraulic device useful to control the rate at which commercial aircraft overhead storage bin doors open and close. Enidine describes its device as "a normally retracted, self-contained, hydraulically damped, spring actuator." · (D.Memo, p. 6.) At issue is its seal assembly. "[T]he assembly includes an annular elastomeric seal, a wedge, a coil spring, and a bearing retainer. The seal has an outer lip in sealing contact with the bearing retainer and an inner lip in sealing contact with the piston rod." (D.Memo, pp. 7–8.) Figure A, which Hydraflow has provided as an exhibit, depicts the Enidine seal assembly. It shows a wedging element **1**; an inner sealing lip **3**, adjacent to a piston rod **2**; and an outer sealing lip **4**, adjacent to the wall of a cylinder **5**.

### 3. *Difference Between the Seal Assemblies*

The difference between the Enidine seal assembly and what the '745 patent claims is, of course, what the parties dispute. Without preempting any legal issues, what distinguishes the Enidine seal assembly from the drawings, specifications, and, as Enidine argues, the plain language of Claim 1 of the '745 patent, is that the Enidine wedging element only contacts the outer sealing lip. The specifications and drawings in the '745 patent (and according to Enidine the language of Claim 1) calls for a wedge that contacts both the inner and outer sealing lips. The background of the '745 patent describes a wedge that "applies radial loads to the inner and outer lips of a seal." In the Enidine seal assembly, "all of the radial load

on the inner sealing lip is imposed by the stress within the inner lip itself." (P2. Memo, pp. 13–14.)

## DISCUSSION

The first issue before this Court is whether any triable issues exist with respect to patent infringement. Both Enidine's summary judgment motion and Hydraflow's summary judgment motion regarding claim infringement address this issue and will be considered together. Hydraflow also has filed a summary judgment motion on Enidine's defamation and tortious interference counterclaims. Before resolving whether the counterclaims raise any triable issues, this Court will address the motions for summary judgment on patent infringement.

### A. Summary Judgment Standards

Federal Rule of Civil Procedure 56(c) provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." *Id.* at 248, 106 S.Ct. at 2510.

Under Rule 56, a party moving for summary judgment can meet its burden either by producing evidence showing the absence of a genuine issue of material fact or by pointing out to the court that there is an absence of evidence supporting one or more essential elements of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Furthermore, Rule 56(e) provides: When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). The function of the court is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. A summary judgment motion will not be defeated, however, merely on the basis of a "metaphysical doubt" about the facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), "or on the basis of conjecture or surmise," *Bryant*, 923 F.2d at 982. The nonmoving party must come forward with significant probative evidence in support of its complaint. *See Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, Inc.*, 996 F.2d 537, 542 (2d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993).

Summary judgment is appropriate in patent cases, as in other cases, where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *See Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831 (Fed.Cir.1984); *Townsend Engineering Co. v. HiTec Co.*, 829 F.2d 1086, 1089 (Fed.Cir. 1987). "[T]he motion of an accused infringer for judgment on the ground of non-infringement of a patent may be granted where the patentee's proof is deficient in meeting an essential part of the legal standard for infringement." *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1578 (Fed.Cir.1989) (citations omitted). An accused infringer "is entitled

to summary judgment, on the ground of non-infringement, by pointing out that the patentee failed to put forth evidence to support a finding that a limitation of the asserted claim was met by the structure in the accused devices." *Id.* at 1578.

Used properly, Rule 56 is a "vital procedural tool to avoid wasteful trials," *Capital Imaging*, 996 F.2d at 541, and "to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2553.

## B. *Claim Infringement*

Enidine moves for summary judgment dismissing Hydraflow's claim of patent infringement. Enidine contends the '745 patent excludes a seal assembly in which the wedge does not contact both sealing lips. There is no genuine issue, Enidine submits, as to the fact that the wedge element in its snubber does not touch the inner sealing lip of the seal assembly. Its snubber, therefore, does not infringe Claim 1 of the '745 patent either literally or under the doctrine of equivalents as a matter of law. Hydraflow disagrees. It argues that the language of Claim 1 does not exclude a seal assembly in which the wedge touches only one of the two sealing lips. Hydraflow seeks a partial summary adjudication as to that interpretation.

■■■ "An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir.1995) (internal citation omitted); *see also Stiftung v. Renishaw PLC*, 945 F.2d 1173, 1177 (Fed.Cir.1991) ("Analysis of whether an accused device infringes a claim of a patent begins with a determination of the scope of the claim.... The properly interpreted claim must then be compared with the accused device.") (citing *Mannesmann Demag Corp. v. Engineered Metal*

*Products Co.*, 793 F.2d 1279, 1282 (Fed.Cir. 1986)). Claims are construed as a matter of law by the district court. *Markman*, 52 F.3d at 977; *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 821 (Fed.Cir.1992). "It is only *after* the claims have been *construed without reference to the accused device* that the claims, as so construed, are applied to the accused device to determine infringement." *SRI International v. Matsushita Electric Corporation of America*, 775 F.2d 1107, 1118 (Fed.Cir.1985) (citing *Palumbo v. Don–Joy*, 762 F.2d 969, 974 (Fed.Cir.1985)).

### 1. *Claim Interpretation*

■■■ The first part of the analysis, claim interpretation, begins with the language of the claim itself. *Stiftung*, 945 F.2d at 1177 (citing *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 859 F.2d 878, 882 (Fed.Cir.1988)). A court interpreting a patent claim may also look to the patent's specification, prosecution history, other claims, and expert testimony. *Atlantic Thermoplastics Co., Inc. v. Faytex Corp.*, 970 F.2d 834, 837 (Fed.Cir.1992); *see also Stiftung*, 945 F.2d at 1177; *SmithKline*, 859 F.2d at 882; *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1579 (Fed.Cir.1988); *Perini America, Inc. v. Paper Converting Machine Co.*, 832 F.2d 581, 584 (Fed.Cir.1987).[4] "This interpretation proceeds from the vantage point of one skilled in the art." *Atlantic Thermoplastics*, 970 F.2d at 837 (citing *SmithKline*, 859 F.2d at 882).

The issue of claim interpretation presented on these motions, as already explained, is whether Claim 1 of the '745 patent excludes a seal assembly in which the wedge means touches only one of the two sealing lips.

#### a. *Claim Language*

■■■ Claim interpretation begins with the claim language itself. *ZMI Corp.*, 844 F.2d at 1579; *McGill, Inc. v. John Zink Co.*, 736 F.2d 666, 672 (Fed.Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404

---

4. "To ascertain the meaning of claims, we consider three sources: The claims, the specification, and the prosecution history." *Markman*, 52 F.3d at 979 (quoting *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed.Cir.1991)) (other citations omitted). "Expert testimony, includ-ing evidence of how those skilled in the art would interpret the claims, may also be used." *Markman*, 52 F.3d at 979 (citing *Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627, 631 (Fed.Cir. 1987)).

(1984). The language at issue in Claim 1 calls for:

> integral annular wedge means cooperating with said circular recess for applying radial loads to said inner and outer sealing lips to force said lips into sealing relationship with said cylindrical rod and seal receiving bore, respectively, said circular recess and wedge means being proportioned so that the load applied to said inner sealing lip is greater than the radial load applied to said outer sealing lip . . .
>
> whereby the radial load applied to said inner sealing lip is greater than the radial load applied to said outer sealing lip.

(Ralabate Aff. ¶ 2, exh. 1, Col. 6, lines 1–9, 22–25; P2. Facts, exh. E, Col. 6, lines 1–9, 22–25.) [5]

Enidine contends that the clear language of Claim 1 requires a wedge to apply radial loads to both an inner and outer sealing lip. "[A]pplying radial loads to said inner and outer sealing lips" requires the annular wedge means to contact both lips. (D.Memo, pp. 12–20.) Hydraflow disagrees. It argues that this language does not exclude a structure in which a wedge contacts only one of the sealing lips. Claim 1 calls for a "wedge means cooperating with said circular recess for applying radial loads" and does not recite that the wedge means must contact both seal lips. Rather, the '745 patent teaches that two load sources cause the seal lips to bear against the rod and bore, namely the wedge

and the lips themselves. The seal is larger than the bore into which it fits—an "interference fit"—generating radial loads independent of the wedge. The "cooperating" limitation of Claim 1, according to Hydraflow, requires both the wedge and the stress in the lips themselves to contribute to the recited loads. Since nothing in the language of Claim 1 requires the wedge to contribute to the radial loads on both lips, Claim 1 does not require the wedge to contact both lips. (P2.Memo, pp. 12–18.)

The problem with this interpretation is that Claim 1 clearly calls for a wedge applying radial loads to the inner and outer sealing lips. The claim specifically teaches that the wedge cooperates with the recess for applying radial loads to the seal lips. The claim, in other words, identifies the wedge, cooperating with the recess, as the source of the radial loads, not the lips themselves. Under Hydraflow's proposed interpretation, "[w]hether [the Enidine wedge means] cooperates by wedging one or both lips against the adjacent structures is not required." (P2. Memo, p. 8.) Claim 1, however, does not call for a wedge applying radial loads to the inner sealing lip *or* the outer sealing lip; it calls for a wedge applying radial loads to the "inner *and* outer sealing lips" (emphasis added). The issue is whether a wedge can apply radial loads to both lips if it only contacts one lip. Hydraflow concedes that if the wedge does not contact a lip, the wedge

---

5. Claim 1 reads in its entirety:

In a seal assembly the elements comprising:

an annular elastomeric seal element having an outer annular side adapted to be received in sealing relationship within a seal receiving bore, a central axial bore generally concentric with said outer annular side and adapted to receive a cylindrical rod in sealing sliding relationship, a first end, a second end, and a circular recess in said second end extending generally concentrically with said axial bore and opening axially of said seal element to define an inner sealing lip adapted to seal with said cylindrical rod and an outer sealing lip adapted to seal with said seal receiving bore; and

a seal actuator element including guide means for aligning said actuator element with said seal element, and integral annular wedge means cooperating with said circular recess for applying radial loads to said inner and outer sealing lips to force said lips into sealing

relationship with said cylindrical rod and seal receiving bore, respectively, said circular recess and wedge means being proportioned so that the load applied to said inner sealing lip is greater than the radial load applied to said outer sealing lip, the walls of said circular recess defining generally frusto-conical surfaces which diverge outwardly toward said integral annular means and the walls of said wedge means defining generally frusto-conical surfaces which converge inwardly toward said circular recess, said walls being proportioned so that the walls of said wedge means converge more rapidly relative to the radially inner wall of said circular recess than the radially outer wall of said wedge means converges relative to the radially outer wall of said circular recess whereby the radial load applied to said inner sealing lip is greater than the radial load applied to said outer sealing lip.

(Ralabate Aff. ¶ 2, exh. 1; P2. Facts, exh. E.)

**650**

itself does not apply a radial load to it. (P2. Memo, p. 13; P2. R.Memo, p. 4.) Dr. James E. Brunton, Hydraflow's patent law witness, agreed that the converging wall of the inner portion of the wedge would have to touch the wall of the inner sealing lip to exert a radial load on it. (Perlman Aff. ¶ 13, exh. 6, p. 61.)

In short, Claim 1 calls for a wedge "applying radial loads to said inner and outer sealing lips." To apply a radial load, the wedge must contact the lip. Claim 1, by its own language, calls for a seal assembly in which the wedge contacts both lips.

The more specific language at issue in Claim 1, that explains the cooperation between the wedge and circular recess in detail, supports this conclusion:

> the radially inner wall of said wedge means converging more rapidly relative to the inner wall of said circular recess than the radially outer wall of said wedge means converges relative to the radially outer wall of said circular recess whereby the radial load applied to said inner sealing lip is greater than the radial load applied to said outer sealing lip.

(Ralabate Aff. ¶ 2, exh. 1, Col. 6, lines 17–25; P2. Facts, exh. E, Col. 6, lines 17–25.) This merely recites how the wedge applies the radial loads to the inner and outer sealing lips—the wedge applies a greater load to the inner lip than to the outer lip. To apply the greater load to the inner lip, the wedge must contact it. To apply the lesser load to the outer lip, the wedge must contact it. The plain language of Claim 1 calls for a seal assembly with a wedge that contacts an inner lip and an outer lip.

### b. *Specification*

■ The specification is also relevant to ascertain the meaning of Claim 1. *ZMI Corp.*, 844 F.2d at 1579. "Claims must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979 (citing *Autogiro Company of America v. United States*, 384 F.2d 391, 397 (Ct.Cl. 1967)). It is, however, "[t]he claim, not the specification, [that] measures the invention." *Environmental Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 699 (Fed.Cir. 1983) (citing *Continental Paper Bag Co. v.*

*Eastern Paper Bag Co.*, 210 U.S. 405, 420, 28 S.Ct. 748, 752, 52 L.Ed. 1122 (1908)), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984); *SRI International*, 775 F.2d at 1118. "For claim construction purposes, the description [in the specification] may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman*, 52 F.3d at 979.

Hydraflow contends that Enidine has wrongly argued that Claim 1 must include an unstated limitation found in the specification, namely that the wedge must contact both lips. (P.Memo, p. 6.) This contention is inapposite, however, since, for the reasons explained above, the plain language of Claim 1 does contain that limitation.

Enidine's argument, more accurately stated, is that the '745 patent's specifications and drawings simply confirm what the claim itself makes clear, that the wedge must contact both lips. The patent's background section explains that

> [t]he present invention provides a seal assembly in which a single, integral, annular wedging element applies radial loads to the inner and outer lips of a seal in such a way that the loads applied to the respective sealing lips are applied uniformly around the circumferences of the individual lips, but as between the two lips the loads are proportioned so that the inner lip on the dynamic side of the seal receives a greater load than the outer lip on the stationary side of the seal.

(Ralabate Aff. ¶ 2, exh. 1, Col. 2, lines 45–50; P2. Facts, exh. E, Col. 2, lines 45–50.) The specification explains how the wedge applies radial loads to the inner and outer sealing lips:

> At the base of annular inner wedge portion 40 where converging walls 74 and 76 are furthest apart, the wedge portion 40 is thicker than the distance between walls 54 and 56 at the top of the U-shaped recess so that as integral wedge portion 40 advances into circular recess 52 converging walls 74 and 76 contact diverging walls 54 and 56 at the top of the U-shaped circular recess 52 so as to force the outer-most edges 62 and

66 into contact with the respective adjacent structure to accomplish the intended sealing function. The diameters of circular recess 52 and annular inner wedge portion 40 are chosen so that converging walls 74 and 76 contact diverging walls 54 and 56 about simultaneously as wedge portion 40 is urged by helical compression spring 42 into circular recess 52.... The converging wall 74 thus exerts a greater radial load on sealing lip 60 than is exerted by converging wall 76 on sealing lip 64.

(Ralabate Aff. ¶ 2, exh. 1, Col. 4, lines 23–26, 41–43; P2. Facts, exh. E, Col. 4, lines 23–26, 41–43.) Figure 2 in the '745 patent, to which this specification refers, shows the inner side of wedge contact the inner sealing lip, and the outer side of the wedge contact the outer sealing lip.

The explanation in the specifications, with the corresponding drawing, that the wedge contact both the inner and outer sealing lips confirms the plain language of Claim 1.[6]

### c. Other Claims in the '745 Patent

Also relevant to claim interpretation are the other claims in the patent. *SmithKline,* 859 F.2d at 882. Hydraflow argues that certain limitations in Claims 3 and 4 of the '745 patent indicate that Claim 1 does not exclude a structure in which the wedge only contacts one seal lip. (P2. Memo, pp. 14–15, P2. R.Memo, p. 5.) Claim 3 recites "an integral annular wedge means for contacting both said radially inner and radially outer sealing lips." Claim 4 also recites "an integral annular wedge means for contacting both said inner and outer sealing lips." (Ralabate Aff. ¶ 2, exh. 1, Col. 7, lines 8–10, Col. 8, lines 2–3; P2. Facts, exh. E, Col. 7, lines 8–10, Col. 8, lines 2–3.) Under the doctrine of claim differentiation, Hydraflow argues, the "both" limitations of Claims 3 and 4 should not be read into Claim 1.

■ The concept of claim differentiation states that claims should be presumed to cover different inventions. This means that an interpretation of a claim should be

avoided if it would make the claim read like another one. Claim differentiation is a guide, not a rigid rule. If a claim will bear only one interpretation, similarity will have to be tolerated.

*Autogiro,* 384 F.2d at 404; *see also Laitram Corporation v. Rexnord, Inc.,* 939 F.2d 1533, 1538 (Fed.Cir.1991). In other words, "when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining ... infringement." *SRI International,* 775 F.2d at 1122 (citing *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1570 (Fed.Cir.1983); *Environmental Designs, Ltd.,* 713 F.2d at 699; *Palumbo,* 762 F.2d at 977). Claim differentiation serves to avoid interpretations that would render other claims superfluous. *SRI International,* 775 F.2d at 1122.

According to Hydraflow, Claims 3 and 4, not Claim 1, require the wedge to contact both sealing lips. To read that limitation into Claim 1, Hydraflow argues, would render the claims redundant. Claim 1, however, bears only one interpretation. It requires, for reasons already explained, that the wedge apply radial loads to, and therefore contact, both sealing lips. This one interpretation, which the specifications and drawings clearly support, does not render any other claims superfluous. Claim 3, for example, recites a guide means and changes in the respective radial loads as the wedge moves axially toward the seal. Claim 4 calls for a snubber including a cylinder and rod with means for acting on fluid to dampen the movement between the rod and piston. The fact that Claim 1 recites a wedge applying radial loads to the inner and outer sealing lips does not render Claims 3 and 4 superfluous.

### d. Conclusion

Construing the plain language of Claim 1, the specifications and drawings, and other claims in the patent, this Court must interpret Claim 1 to exclude a seal assembly in which the wedge contacts, and thus applies a radial load to, only one of two sealing lips.

---

6. A court may also look to the prosecution history to interpret a claim. *ZMI Corp.,* 844 F.2d at 1580; *McGill, Inc.,* 736 F.2d at 673. The parties barely addressed this factor beyond noting that the issue of contact between one seal lip and the wedge was not mentioned during prosecution of the application leading to the '745 patent. (P2. Memo, p. 20; D2. Memo, p. 19.)

Hydraflow asks this Court to find that the '745 patent teaches that there are two sources for the radial loads applied to the seal lips, the loads which result from stretching and compressing the respective lips, and the loads which the wedge applies. (Soom Dec. ¶ 6.) The specifications do clearly contemplate such an "interference fit" of the sealing lips. (Ralabate Aff. ¶ 2, exh. 1, Col. 3, lines 48–61; P2. Facts, exh. E, Col. 3, lines 48–61.) The question is what bearing, if any, this has on the teachings of Claim 1.

Claim 1 calls for a wedge, cooperating with a circular recess, "for applying radial loads to said inner and outer sealing lips." Hydraflow submits that loads which result from the stretching and compressing of seal lips are applied "to" the seal lips. Enidine responds that loads generated by seal lips are applied "to" something else, not to the seal lips themselves. Even if someone skilled in the art would understand that loads generated by the lips are applied "to" the lips as Hydraflow contends, the issue is not dispositive. Whether lips in an "interference fit" apply loads "to" themselves or "to" something else, the language of Claim 1 teaches that the wedge must apply loads to the inner and outer lips. Claim 1 speaks of radial loads that a wedge applies to the sealing lips, not radial loads the lips may apply to themselves. The specifications fully support this teaching. They depict a wedge applying radial loads to both the inner and the outer lips, which themselves are stretched and compressed.

Contrary to Hydraflow's contention, the teachings of Claim 1 clearly require that the source of the load on the inner lip include a load applied by the wedge element. Since Hydraflow concedes that a wedge must contact a sealing lip to apply a load to it, Claim 1 does exclude a structure in which the wedge contacts only one of the two sealing lips.

## 2. *Comparison of Claim to Accused Device*

■ Having interpreted Claim 1 of the '745 patent, this Court must now compare the claim with the accused device. *See Stiftung*, 945 F.2d at 1178–79. The patentee has the burden of proving infringement by a preponderance of the evidence. *SRI Inter-*national, 775 F.2d at 1123; *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753 (Fed.Cir. 1984); *SSIH Equipment S.A. v. United States International Trade Commission*, 718 F.2d 365 (Fed.Cir.1983). "Infringement of a claim requires that the accused device meet every limitation of the claim, either literally or by equivalents." *Stiftung*, 945 F.2d at 1178 (citing *Builders Concrete, Inc. v. Bremerton Concrete Products Co.*, 757 F.2d 255, 257 (Fed.Cir.1985)). Literal infringement is a question of fact, as is infringement by equivalents. *Intel Corp. v. United States International Trade Commission*, 946 F.2d 821, 841 (Fed.Cir.1991) (citing *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1269–70 (Fed.Cir.1986); *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1575 (Fed.Cir.1985)).

### a. *Literal Infringement*

■ "Literal infringement may be found when an accused device falls within the asserted claims as properly construed." *In re Hayes Microcomputer Products, Inc. Patent Litigation*, 982 F.2d 1527, 1541 (Fed.Cir. 1992) (citing *Palumbo*, 762 F.2d at 974). Hydraflow does not dispute that the wedge in the Enidine snubber contacts only the outer seal lip and applies no radial load to the inner sealing lip while at rest. (P2. Memo, p. 13; P2. R.Memo, p. 4.) Andres Soom, a Hydraflow expert engineer, testified that the inner side of the wedge does not touch the inner sealing lip of the Enidine device in a static condition. (Perlman Aff. ¶ 13, exh. 5, p. 36.) James E. Brunton, Hydraflow's expert patent lawyer, agreed that the inner side of the wedge applies no radial load to the inner sealing lip of the Enidine snubber in the static condition. (Perlman Aff. ¶ 13, exh. 6, p. 42.) Two Enidine engineers, Brian C. Bucholtz and Benjamin T. Houghton, opined that the Enidine wedge does not touch or apply any load to the inner lip. (Perlman Aff. ¶ 13, exh. 4, p. 8; Perlman2 Aff. ¶ 4, exh. 2, p. 17.)

In fact, no contrary proof has been presented that the Enidine wedge ever contacts or otherwise applies any radial load to the inner sealing lip. An accused infringer "is entitled to summary judgment, on the ground of non-infringement, by pointing out

that the patentee failed to put forth evidence to support a finding that a limitation of the asserted claim was met by the structure in the accused devices." *Johnston*, 885 F.2d at 1578. Mr. Brunton conceded that the Enidine device does not have a seal assembly in which a single, integral, annular wedging element applies radial loads to the inner and outer lips of a seal. (Perlman Aff. ¶ 13, exh. 6, p. 52.) With no genuine issue as to that fact, Enidine is entitled to summary judgment that its device does not literally infringe the '745 patent.[7]

### b. *Structural Equivalents*

The parties have also construed Claim 1 of the '745 patent as including means-plus-function limitations. Plaintiff argues that if a seal assembly in which the wedge only touches the outer sealing lip is not within the disclosure, there is a triable issue of fact as to structural equivalents. (P2. R.Memo, p. 9.)

▮ The Patent Act provides explicit guidelines for claim elements expressed in means-plus-function terms:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification or equivalents thereof.

35 U.S.C. § 112, ¶ 6. The Federal Circuit has explained:

In applying the "means plus function" paragraph of § 112 . . . the sole question is whether the single means in the accused device which performs the function stated in the claim is the same as or an equivalent of the corresponding structure described in the patentee's specification as performing that function.

*D.M.I., Inc.*, 755 F.2d at 1575. To meet a means-plus-function limitation, an accused device "must employ means identical to or the equivalent of the structures, material, or acts described in the patent specification. The accused device must also perform the identical function as specified in the claims." *Valmont Industries, Inc. v. Reinke Manufacturing Co., Inc.*, 983 F.2d 1039, 1042 (Fed. Cir.1993); *see also Intel Corp.*, 946 F.2d at 841; *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934 (Fed.Cir.1987) (in banc), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988).

▮ Hydraflow argues that the Enidine seal assembly performs the same function specified in Claim 1, namely preventing fluid from leaking past the seal. The Enidine seal assembly is thus equivalent because it functions identically to Claim 1. (P2. Memo, p. 20.) The premise of Hydraflow's argument is that it is immaterial under Claim 1 whether the load is imposed by both sources (the wedge and the lip) on both lips or by one source on the inner lip and both sources on the outer lip. (P2. Memo, p. 20.)

Hydraflow interprets Claim 1 too broadly. It submits that the function claimed, "reduced to its essence," is "preventing fluid from leaking past the seal." (P2. Memo, p. 20.) The means-plus-function limitation Hydraflow recites, however, is "integral annular wedge means cooperating with said circular recess for applying radial loads to said inner and outer sealing lips to force said lips into sealing relationship with said cylindrical rod and seal receiving bore, respectively...." (Ralabate Aff. ¶ 2, exh. 1, Col. 6, lines 1–5; P2. Facts, exh. E, Col. 6, lines 1–5.) "That part of a claim contains means-plus-function language does not make section 112 ¶ 6 applicable to the entirety of the claim." *Johnston*, 885 F.2d at 1580.

The means-plus-function limitation at issue specifies that a wedge functions to apply radial loads to both an inner and an outer sealing lip. Nothing in the accused device

---

7. Mr. Brunton conceded this conclusion based on the claim interpretation. When asked to assume that Claim 1 of the '745 patent requires the wedge to contact the inner lip of the seal and produce a radial load, Brunton responded:

Well, it's my understanding that the, in the Enidine device, the wedge does not contact the inner lip of the seal. This being the case, it would be my opinion that there is no literal infringement of claim one if claim one is interpreted in the manner that you suggest in your question.

(Perlman Aff. ¶ 13, exh. 7, p. 5.)

functions to apply radial loads to both sealing lips to force them into a sealing relationship with the cylindrical rod. While the sealing lips in the accused device may themselves exert stress against the rod and seal receiving bore, they do not perform the function stated in the claim—an application of separate radial loads to the lips themselves. The means-plus-function language at issue does not recite that sealing lips function to exert stress against the rod and bore. A wedge, rather, functions to apply a force to the lips separate from the force the lips themselves may apply against the rod and bore in an "interference fit." There is no genuine issue as to the fact that neither the wedge nor any other structure in the accused device applies a radial load to the inner lip, the function specified in the claim. As such, Enidine is entitled to summary judgment that the accused device does not infringe Claim 1 of the '745 patent as a structural equivalent.

### c. Doctrine of Equivalents

■ The last issue concerning infringement is whether Enidine is entitled to summary judgment that there is no infringement under the doctrine of equivalents. "The doctrine of equivalents has a different purpose and application than section 112. The doctrine of equivalents prevents a copyist from evading patent claims with insubstantial changes." *Valmont Industries, Inc.,* 983 F.2d at 1043 (citing *Charles Greiner & Co. v. Mari–Med Mfg.,* 962 F.2d 1031, 1036 (Fed. Cir.1992)). "[W]here an infringer, instead of inventing around a patent by making a substantial change, merely makes an insubstantial change, essentially misappropriating or even 'stealing' the patented invention, infringement may lie under the doctrine of equivalents." *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1538 (Fed.Cir.1991) (citations omitted).

■ The doctrine of equivalents typically involves a three-part inquiry. An accused device which "performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention," *Pennwalt,* 833 F.2d at 934, is an equivalent. *See Graver Tank and Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608, 70

S.Ct. 854, 856, 94 L.Ed. 1097 (1950); *Corning Glass Works v. Sumitomo Electric U.S.A., Inc.,* 868 F.2d 1251, 1258 (Fed.Cir.1989). However, "evidence beyond function, way, and result is also relevant to the doctrine of equivalents." *Hilton Davis Chemical Co. v. Warner–Jenkinson Co., Inc.,* 62 F.3d 1512, 1518 (Fed.Cir.1995). "[A]ll evidence relevant to the substantiality of the differences" may be considered. *Id.*

The doctrine does not obviate "the fundamental principle that claims define the limits of patent protection," *Charles Greiner & Co.,* 962 F.2d at 1036 (citing *Continental Paper Bag Co. v. Eastern Paper Bag Co.,* 210 U.S. 405, 419, 28 S.Ct. 748, 751, 52 L.Ed. 1122 (1908)) ("[T]he claims measure the invention."):

> Application of the doctrine of equivalents is the exception, however, not the rule, for if the public comes to believe (or fear) that the language of patent claims can never be relied on, and that the doctrine of equivalents is simply the second prong of every infringement charge, regularly available to extend protection beyond the scope of the claims, then claims will cease to serve their intended purpose.

*London,* 946 F.2d at 1538.

■ The Federal Circuit recently restated that infringement under the doctrine of equivalents is an issue of fact. *Hilton Davis Chemical Co.,* 62 F.3d at 1520–21. This Court therefore must determine whether there exist any genuine issues of material fact as to equivalency, and whether Enidine is entitled to a judgment of non-infringement as a matter of law. As plaintiff, Hydraflow has the burden to proffer evidence that Enidine's device meets each and every limitation of Claim 1 by a substantial equivalent. *See Becton Dickinson & Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 796 (Fed.Cir.1990). To prevail on its motion for summary judgment, Enidine must establish the absence of evidence directed to proof of a matter on which Hydraflow bears the burden of proof, and which is necessary to establish its case. *Id.* at 798. Summary judgment is proper if there is no genuine issue of material fact that one or more claim limitations are not met equivalently in the accused device. *Id.*

■ In support of its motion, Enidine has submitted the evidence already discussed that the Enidine wedge does not contact or otherwise apply a radial load to the inner sealing lip. This evidence, Enidine argues, bears on function, way, and result in the equivalency analysis. (D2. Memo, pp. 27–29.) Hydraflow's opposition to this aspect of Enidine's motion consists of a few conclusory statements. Hydraflow states, first, that the following genuine issues exist: (1) "Whether the prosecution history of Mahoff '745 contains anything which precludes the application of the doctrine of equivalents to expand the coverage of claim 1 of Mahoff '745 to include the accused Enidine seal assembly"; (2) "Whether the doctrine of equivalents should be applied to expand the coverage of claim 1 of Mahoff '745 to include the accused Enidine seal assembly." (P. Facts, p. 5.) Hydraflow concludes its memorandum in response to Enidine's motion that "defendant proposes no facts with respect to the factual issue[ ] of ... the doctrine of equivalents." (P. Memo, pp. 13–14.) In the body of the memorandum, Hydraflow states that "[a]ny analysis looking towards the application of the doctrine of equivalents would need to consider the facts as they appear in the prosecution history of Mahoff '745, and the facts surrounding defendant's copying of plaintiff's patented device." (P. Memo, p. 4.)

That conclusory argument is not sufficient to defeat a motion for summary judgment. Hydraflow does not specify which facts in the prosecution history tend to prove that Enidine's device meets the limitations of Claim 1 by equivalency. It also presents no facts "surrounding defendant's copying of plaintiff's patented device." As Enidine points out, Hydraflow "has offered no evidence showing equivalence between the device claimed in the Mahoff Patent and the Enidine device wherein the wedge does not contact the inner lip of the seal." (D.Memo, p. 29.) Indeed, "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552.

The wedge in Claim 1, as explained, functions to apply radial loads to an inner lip and an outer lip. Enidine has offered evidence bearing on function, way, and result in arguing that the doctrine of equivalents does not apply. Hydraflow puts forth no contrary evidence from the prosecution history or Enidine's "copying." With the only evidence of record tailored toward the function-way-result test, *Hilton Davis Chemical Co.*, 62 F.3d at 1523, the accused device does not perform substantially the same function—a wedge applying radial loads to both the inner and the outer sealing lips. It also necessarily does not perform that function in substantially the same way, by contacting both lips in certain relative proportions with a circular recess. The Federal Circuit "has repeatedly stated that the doctrine [of equivalents] must not clash with the legal significance of the claims." *Charles Greiner & Co.*, 962 F.2d at 1036. While the Enidine device accomplishes sealing against the rod through a sealing lip in an interference fit, Claim 1 discloses a wedge functioning to apply a load to the lip itself. Absent this element of Claim 1, there can be no infringement. No reasonable jury could find otherwise based on the evidence presented.

Because the undisputed evidence presented shows that Enidine's device did not meet the limitations in Claim 1, literally or by equivalents, Enidine is entitled to summary judgment dismissing Hydraflow's patent infringement claim as a matter of law.

### C. *Counterclaims*

Enidine has asserted three counterclaims in its answer to Hydraflow's complaint. Enidine seeks a declaratory judgment of non-infringement and invalidity of the '745 patent, and alleges causes of action for libel and/or slander per se and tortious interference with contract. For the reasons explained above, Enidine is entitled to summary judgment of non-infringement as a matter of law. Hydraflow seeks summary judgment dismissing Enidine's second and third counterclaims for libel and/or slander per se and tortious interference with contract. Enidine does not oppose Hydraflow's

motion with respect to the third counterclaim, and that part of Hydraflow's motion will be granted.

Enidine does oppose Hydraflow's motion with respect to the second counterclaim. Enidine alleges in the second counterclaim that "in January or February 1988, counterclaim defendant [Hydraflow] contacted Boeing Commercial Aircraft Company, a division of The Boeing Company ("Boeing"), a company with which Enidine had a contract to sell actuators, and stated to Boeing that Enidine's actuators infringed upon U.S. Patent Number 3,999,745." (Answer ¶ 17.) The evidence of record is that in January or February 1988, Bruce Jagger, Hydraflow's patent counsel, and Leonard Ullrich, Hydraflow's president, met with James Hamley, Boeing's patent counsel. (Perlman1 Aff. ¶ 2, exh. 2, p. 11.) Jagger told Hamley that he thought the Enidine device infringed the '745 patent. (Perlman1 Aff. ¶ 2, exh. 2, pp. 25–26.) Enidine claims that this statement constitutes libel and/or slander per se. (Answer ¶ 19.)

Hydraflow responds on this motion that its statements were not libelous and/or slanderous per se, that the statements were privileged, and that they were not made with actual or common law malice. (P1. Memo, p. 1.) Enidine agrees that the statements at issue here were subject to a qualified privilege. (D1. Memo, p. 5.) What this Court must resolve, therefore, is whether there is a genuine issue of material fact bearing on abuse of privilege or, in other words, actual malice.

 The parties dispute, as an initial matter, whether New York or Washington state law applies to the defamation claim. There is no need to resolve this tempting conflict of law issue here since the pertinent law on abuse of the qualified privilege is identical in New York and Washington.[8] "The shield provided by a qualified privilege may be dissolved if plaintiff can demonstrate that defendant spoke with 'malice.'" *Liberman v. Gelstein*, 80 N.Y.2d 429, 437, 590 N.Y.S.2d 857, 862, 605 N.E.2d 344, 349 (1992) (citations omitted). The New York Court of Appeals has held that "actual malice" will defeat a qualified privilege.[9] The Supreme Court established in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964), that "actual malice" means "knowledge that [the statement] was false or ... reckless disregard of whether it was false or not." The Supreme Court of Washington has held, as has the New York Court of Appeals, that "proof of knowledge or reckless disregard as to the falsity of a statement is required to establish abuse of a qualified privilege." *Guntheroth v. Rodaway*, 107 Wash.2d 170, 177 n.2, 727 P.2d 982, 985 n.2 (1986) (citations omitted).

 "Under the *Times* malice standard, the plaintiff must demonstrate that the 'statements [were] made with [a] high degree of awareness of their probable falsity.'" *Liberman*, 80 N.Y.2d at 438, 590 N.Y.S.2d at 863, 605 N.E.2d at 350 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964)). "[M]erely establishing falsity of the statement is not enough to overcome the privilege." *Messerly v. Asamera Minerals, Inc.*, 55 Wash.App. 811, 818, 780 P.2d 1327, 1331 (1989). "[T]here is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action." *Liberman*, 80 N.Y.2d at

8. Hydraflow explicitly recognized in its reply memorandum that "Washington and New York law are identical on the need to prove 'actual malice' (knowledge or reckless disregard for the falsity of a statement) in order to overcome a qualified privilege." (Pl. R.Memo, p. 5.)

9. The New York Court of Appeals has explained that malice has "assumed a dual meaning" under common law and constitutional standards. *Id.*, 80 N.Y.2d at 438, 590 N.Y.S.2d at 863, 605 N.E.2d at 350. Under the common law, malice meant "evil intent or a motive arising from spite or ill will." *Id.* Enidine has not argued common-law malice on the evidence presented, and this Court agrees with Hydraflow that no triable issue exists in that regard. The Court of Appeals has "recognized that the constitutional as well as the common-law standard will suffice to defeat a conditional privilege." *Id.* A "triable issue is raised only if a jury could reasonably conclude that 'malice was the one and only cause for the publication.'" *Id.*, 80 N.Y.2d at 439, 590 N.Y.S.2d at 863, 605 N.E.2d at 350 (citation omitted). The record is void of any such evidence of common-law malice.

438, 590 N.Y.S.2d at 863, 605 N.E.2d at 350. The existence of actual malice is a question of fact for the jury "only where there is evidence in the case warranting [its] submission to the jury, and the burden of proof is on the plaintiff." *Stukuls v. State of New York*, 42 N.Y.2d 272, 279, 397 N.Y.S.2d 740, 745, 366 N.E.2d 829, 834 (1977) (citations omitted). "[I]n order to defeat a motion for summary judgment plaintiff[ ] must meet this burden by showing evidentiary facts, not conclusions based upon surmise, conjecture and suspicion." *Vacca v. General Electric Credit Corp.*, 88 A.D.2d 740, 741, 451 N.Y.S.2d 869, 871 (3d Dep't 1982) (citation omitted). "The totality of the defendant's knowledge before publication is considered in making the determination." *Messerly*, 55 Wash.App. at 818, 780 P.2d at 1331 (citation omitted).

■ To demonstrate a genuine issue of material fact as to actual malice, Enidine must provide specific facts from which a jury could find that Hydraflow made its statement to Hamley with a high degree of awareness of its probable falsity. This Enidine has not done. Enidine claims Jagger gave Hamley a "ginned up" test report to demonstrate infringement. (D1.Memo, p. 7.) Independent Testing Laboratories, Inc. ("ITL"), which conducted the test, did not analyze how the Enidine snubber worked in actual operation. (D1. Memo, p. 8.) The Hydraflow engineer who prepared the report from the test results drew conclusions about the axial loads in the Enidine device that the data did not support. (D1. Memo, pp. 9–12.) Enidine submits that Hydraflow used this report to persuade Boeing's attorney that the Enidine snubber infringed the '745 patent. (D1. Memo, pp. 12–13.)

Hydraflow disputes this characterization of the test results. The results, according to Hydraflow, supported its conclusion regarding loads on the Enidine sealing lips. (P1. R.Memo, p. 7.) Though there may be a genuine issue as to what the test results demonstrate, their conclusiveness is not a material fact. Enidine must bring forward facts to show that Hydraflow told Boeing that Enidine infringed its patent with a high degree of awareness that the statement was probably false. Enidine has not produced evidence demonstrating a triable issue in this regard for several reasons.

First, the report addressed whether the Enidine seal actuating element applied greater radial loads in the inward direction than in the outward direction. (Perlman1 Aff. ¶ 2, exh. 8.) Hydraflow's patent infringement claim, as argued to this Court, was not based on the relative loads that the seal actuating element applied. Hydraflow in fact contended, as fully addressed above, that Claim 1 of the '745 patent did not require a wedge to apply any load to the inner sealing lip. While this asserted construction of Claim 1 was rejected as a matter of law, Hydraflow presented a thorough and well-documented legal argument independent of relative radial loads.

The evidence of Hydraflow's basis for telling Boeing that Enidine may be infringing the '745 patent is as follows. During the week of March 31, 1987, certain Boeing engineers told Ullrich that Enidine had "the same seal design as you do." (P2. Facts, exh. G, p. 146.) "There were many engineers around when this happened, so they all told me." (P2. Facts, exh. G, p. 160.) One engineer, Chuck Lee, showed Ullrich a large-scale drawing of the Enidine device. (P2. Facts, exh. G, p. 165.) A Boeing engineer pointed out the seal to him. (P2. Facts, exh. G, p. 166.) Ullrich saw the seal and actuator and, as argued on this motion, "that they cooperated together." (P2. Facts, exh. G, p. 165.) The test performed later in 1987, as Hydraflow points out, involved a disassembly and inspection of the Enidine snubber. (Perlman1 Aff. ¶ 2, exh. 8.)

The undisputed evidence demonstrates that Hydraflow made its statements to Enidine in January or February 1988 based at least on observations of Boeing engineers that the seals were the same, an examination of a drawing of the Enidine device, and disassembly and testing of the Enidine device. Boeing's patent counsel responded in April 1988: "After a careful review with Boeing Engineering, it was our conclusion that the submitted data was inconclusive on the issue of infringement." (P2. Facts, exh. M.)

That Hydraflow may have known its testing was flawed does not raise a triable issue

of fact since its colorable claim of infringement did not stand on the test results. Enidine, which bears the burden of proof on this issue, provided no specific facts from which a reasonable jury could find that Hydraflow was highly aware that its statements of claimed infringement were probably false. With no genuine issue of material fact as to actual malice, Hydraflow's motion for summary judgment on the second counterclaim will be granted.

### CONCLUSION

Since Claim 1 of the '745 patent excludes a structure in which the wedge contacts only one of two sealing lips, Hydraflow's motion for partial summary judgment with respect to claim interpretation will be denied. There is, further, no genuine issue as to the fact that the Enidine device did not meet every limitation of the claim, either literally or by equivalents. Enidine's motion for summary judgment will therefore be granted.

With respect to the counterclaims, Hydraflow's motion for summary judgment dismissing Enidine's third counterclaim will be granted since Enidine does not oppose the motion. Hydraflow's summary judgment motion with respect to the second counterclaim also will be granted since the parties agree that Hydraflow's statements to Boeing in January or February 1988 were subject to a qualified privilege, and there is no triable issue as to actual malice.

### ORDER

IT HEREBY IS ORDERED, that plaintiff's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 with respect to claim interpretation will be DENIED.

FURTHER, that defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 dismissing plaintiff's claim of patent infringement will be GRANTED.

FURTHER, that plaintiff's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 dismissing defendant's

second and third counterclaims will be GRANTED.

SO ORDERED.